NORTH MISSOURI RAILROAD COMPANY, Appellant, v. LACKLAND, Respondent.

1. A proceeding instituted in a circuit court in behalf of the North Missouri Railroad Company, under its charter, to obtain a condemnation of land upon which it had located its railroad, is a proceeding in which the court acts in its judicial capacity ; an appeal will lie to the Supreme Court from the final judgment of the circuit court in such proceeding.

2. *Quere:* Whether it would be competent for the legislature, in providing a mode for the condemnation and appropriation of private property to public uses, to make the judgment of a special tribunal final, and thus place the matter beyond the control of the courts.

3. The North Missouri Railroad Company instituted proceedings under its charter to obtain a condemnation of land upon which its railroad was loca￭ted; *held*, that said company might, at any time before final judgment in such proceeding, change the route of the railroad and dismiss the proceeding.

*Appeal from St. Charles Circuit Court.*

This was a proceeding instituted by the North Missouri Railroad Company to obtain the condemnation, for the use of said company in the construction of its railroad, of a lot in the city of St. Charles belonging to defendant, Norman Lackland. No petition was filed in the office of the clerk of the circuit court, but an agreement under seal was entered into between the parties, whereby three commissioners or viewers were appointed, to whom the question of compensation was referred, and who were by said agreement authorized to assess the value of the property taken, in like manner and with like effect as if they had been duly appointed under the terms of the charter by the judge of the circuit court, and to make report of their proceedings, upon which action might be taken in the circuit court in like manner and with like effect in all respects as if proceedings had been regularly commenced in the mode prescribed in said charter. This agreement was dated September 12, 1855. On the 24th of September, 1855, the viewers or commissioners filed their report in the clerk's office of the court, awarding to defendant damages in the sum of $4200. To this report no exceptions were at any time filed by the plaintiff, North Missouri Railroad Company; but on the 23d of October, 1855—being the second day of the term of the circuit court next after the filing of said report—the company, by its counsel, asked in open court à dismissal of the proceedings; which was thereupon ordered. Defendant's counsel was not in court at the time, and no objection was offered to the dismissal. No motion or other action had then been taken in the case since the filing of the report. On the

North Missouri Railroad Co. v. Lackland.

30th of October, 1855, being at the same term of court, defendant's counsel moved the court to reinstate the case; which was done—the plaintiff's counsel not being present and no objection being offered. At the same time the defendant moved the court to confirm the report of the viewers or commissioners. The case as it then stood was continued to the May term, 1856, at which term the plaintiff filed a motion to dismiss the cause because its railroad had been removed from defendant's land, and was in process of construction on other land than that of defendant; and further, that the land of defendant was not required and could not be used for any of the corporate purposes of the company, and that the plaintiff could not therefore acquire and hold any title to the same under this proceeding.

It appears from an agreed statement, that, at the time of the appointment of commissioners and of the filing of their report, the location of the North Missouri Railroad was upon the land of defendant; but after the report was filed a resurvey was made by plaintiff, which resulted in locating the road upon another route not upon defendant's land; and thereupon the plaintiff abandoned the route over defendant's land, and directed the discontinuance of all pending proceedings for the condemnation of land on the route which went over defendant's land.

The court overruled this motion to dismiss, and sustained that of defendant to confirm the report of the commissioners, and gave judgment against the plaintiff for the amount assessed by the commissioners, and by its decree vested the title to the land in the plaintiff. The court overruled a motion for a review made in behalf of plaintiff; whereupon plaintiff appealed to this court.

*E. A. Lewis* and *Coalter*, for appellant.

I. In proceedings such as the present the relations of the parties are not changed, nor does any new right become vested in either party until the rendition of the judgment. Proceedings of this kind in this country are not as in England in

the nature of a "compelled contract" of purchase and sale. The various acts of Parliament prescribe the following steps: 1st, the railway company must, in its application for a charter, designate the lands over which the proposed road is to run; 2d, being authorized by the charter to purchase the lands designated, and failing to agree with an owner, the company must give him notice that it requires his land, and offer him a fixed price therefor; if no price be offered with the notice, the latter has no validity; 3d, the owner must respond, stating the particulars of his title, and either accepting the offer, or declining it with a counter proposal; 4th, if thus far the parties do not agree, a jury is empanelled to decide between the respective propositions of the parties; 5th, upon the rendering of the verdict this is registered as a deed of conveyance from the land owner to the corporation. Every step from the first to the last is part of a formal negotiation between seller and purchaser, resulting in a transfer for a *price* and not for "compensation." (See Chambers and Peterson on Railways, 174.) Accordingly, the English courts hold that the relation of vendor and purchaser may exist at various periods anterior to the verdict, and that consequently the rights of the parties will have become vested at such periods. These decisions are all based upon the fundamental theory that Parliament, in its omnipotence, constituting and declaring itself an agent of the land owner, bargains and sells his land to a party competent to bargain and buy. The first move in the negotiation is the charter, which specifically designates certain lands, and on behalf of the owners offers them to the company as a proposed purchaser. In this country, however, the whole theory and system are essentially different. Although, perhaps, not precisely analogous, there is at least the same extent of difference between the two systems that appears between acquisition by voluntary contract and acquisition by confiscation. The proceedings here are based upon an implied constitutional power in the state of "taking" private property for public purposes, provided that compensation be made therefor. No negotiation is implied in any

of the statutory provisions. No state or federal court in the Union has yet regarded these proceedings as presenting, at any stage, the elements of a contract between the parties. No legislature in the confederacy has power to compel a man to sell and convey his property to a person or corporation as such. The British Parliament may and does do so. Accordingly, it has been found necessary to do in this country, what was never done in England, to-wit, to settle by adjudication that the construction of a railroad is a " public purpose" and within the meaning of the constitution. Thus all the American adjudications, without exception, treat these proceedings upon the following theory : 1st, the legislature has a right to *take* the property of the individual under certain restrictions and to declare how it will exercise that right ; 2d, when the mode so asserted by the legislature has been fully acted upon, it is then assumed that the state has " taken" the property ; whereupon the owner has a vested right to compensation therefor, whether the state afterwards makes any use of the property or not. Accordingly, in all the New York, New Hampshire, Massachusetts and Missouri cases, where at any stage of the proceedings the right of the public to discontinue was denied, it will be found upon examination that *all the acts* by which the legislature had previously declared it would " take" the property had been consummated. The case in 20 Johns. 269, which may be an apparent exception to this, was afterwards overruled by the same court in the case of The People v. City of Brooklyn, 1 Wend. 322. (See Wilkerson v. Buchanan County, 12 Mo. 328 ; Sess. Acts, 1839, p. 107 ; 2 Metc. 558 ; 4 New Hamp. 517 ; St. François County v. Peers, 14 Mo. 537 ; St. François County v. Marks, 14 Mo. 539 ; Harrington v. Commissioners of Berkshire, 22 Pick. 563.) But while, in all the above cited cases, every thing prescribed by the legislature for the taking of the property had been done as required, in the present case the distinctive feature is presented, that one of the prescribed steps, and that too which is expressly appointed to inaugurate the new relations of the parties, had not been taken when the right to discontinue was

asserted. The land owner's right to compensation can not, in any event, vest before that of the public to the land. Wherever any thing has remained to be done under the charter of a railroad company or a statute, and a discontinuance has been asked for, it has not been denied, but granted as a matter of right. In other words, if the law under which the proceedings were instituted required a judgment at their conclusion, then the public had a right to discontinue at any time before that judgment was entered. (See Hudson River R. R. Co. v. Outwater, 3 Sandf. Sup. C. 689 ; People v. City of Brooklyn, 1 Wend. 332 ; Canal Street case, 11 Wend. 154 ; 6 Johns. Ch. 49 ; Laws of N. Y. 1848, p. 39.) A review of all the adjudications, therefore—as well those in which the right to discontinue was denied as those in which it was admitted—discovers a uniform adherence to the following rules : 1st, the right of the public to discontinue proceedings and abandon the contemplated roadway is unquestionable until rights shall have vested in the parties, whereupon it ceases ; 2d, the right of the owner to the ascertained compensation vests whenever the public acquires the right to use the property, and not before ; 3d, the right of the .public to use the property vests when all the acts pointed out by the special statute—whether that includes a judgment or otherwise— have been consummated, and not before. The recent case of Walther v. Warner, (see ante, p. 277,) has given to these rules a more rigid application, in effect, than that here contended for. The provision of the charter, that upon the filing of the commissioner's award the court " *shall* enter judgment," &c., is merely directory. (Hudson R. R. Co. v. Outwater, 3 Sandf. S. C. 689 ; see also Sess. Acts, 1855, p. 233, § 3 ; Underwood v. Lilly, 10 Serg. & Raw. 151 ; 9 Barb. S. C. 482 ; 6 Barr. 196 ; 2 Dougl. 197 ; 12 Sm. & Marsh. 347 ; 2 Watts & Serg. 251 ; 3 Denio, 382 ; 6 Cranch, 87 ; Sess. Acts, 1853, p. 133, § 23, p. 144, § 56 ; Hoffman v. City of St. Louis, 15 Mo. 651.)

II. An appeal will lie to this court from the judgment of the St. Charles circuit court. The proceedings were before

the court as a court, and in this respect this case may be distinguished from that of The Hannibal & St. Joseph R. R. Co. v. Morton, 20 Mo. 70. The present appeal—being excluded from the practice act of 1849 by article 30, § 6—is governed by the revised code of 1845 (see R. C. 1845, p. 831, § 11), which covers "any final judgment or decision of any circuit court in any civil case."

*C. D. Drake,* for respondent.

I. It is necessary to a proper understanding of this case to consider the position of the parties if the charter of the company contained no power to condemn lands for the company's use. That position would be, the land owner on the one side with a title held in full property against all other men, and the company on the other needing the land, but with no power to obtain it without the owner's assent. The only mode by which the company could obtain it would be by purchase, which in law includes every mode of acquiring land by a lawful act of the party. Every purchase necessarily involves, in some form or other, a purchaser acting in the purchase, and a vendor acting in the sale either by a voluntary act or by the efficacy of some proceeding in law *in invitum* held to be equivalent in its effect and results to the voluntary act. If the land owner refuse to assent, it is therefore impossible for the company to acquire the land. At this point the state, in its sovereign capacity and in the exercise of the right of eminent domain—subject to which the owner holds the land—steps in, and declares by enactment that the company, if certain terms be complied with, shall acquire the land. In this the state does not undertake to dispose of its own property, or to invest the company with its own title, but to dispose of, and invest the company with the title of an individual citizen. But this exercise of the right of eminent domain is limited by the constitutional requirement of just compensation to the owner; and the state therefore undertakes that a just compensation shall be paid him, and at the same time compels him to accept that compensation, and in

consideration thereof to sell his land to the company. Nor does the state in this proceeding speak for and represent itself. Its mere assent to the acquisition of the land by the company would be of no avail to pass the title, for the assent of the owner would still be wanting. When therefore, in the exercise of its paramount authority, the state declares that the company shall have the land—and the company can obtain it only by purchase, and the purchase can not take place without the owner's assent, and the state undertakes to give that assent—the state must be considered as representing the owner, and giving for him and in his name an assent, which, however compulsory on him, is in law regarded as his, which he can not question or repudiate, and the consequences of which he can not avert. The state represents him likewise in protecting his right to a just compensation. While it gives his assent to the sale, and thereby divests him of his property and transfers it to the company, it also demands and compels the payment to him of the compensation; and when this is done, the agency of the state in the matter ceases. In every light therefore the state is the representative of the owner, speaking and acting for him by fundamental right, and without any power in him to gainsay or prevent. Possessing this fundamental right and acting in this representative character, the state declares to the company that it may acquire the land upon the payment of a sum of money to be fixed by three commissioners appointed in a specified mode. This declaration being made in the only way the state could make it—that is, by a written law—there is, so far as the ownership of the land is concerned, an assent or agreement, in the most authoritative form known to our institutions, to sell the land to the company. Whether this be considered as properly and strictly the owner's assent or agreement, as we contend, or as an act of confiscation on the part of the state not involving assent or agreement on his part at all, but directly in opposition to his wishes, and perhaps disregarding and overriding his actual dissent, matters not; for, if only the latter, it is certain that the state does not act for itself but for him, taking his

land and exacting the compensation for it, paying the compensation to him, and then decreeing the land to the company. The sale following the confiscation—if that be the proper term—is without doubt with the state's assent; which assent—being in relation to the owner's property, and having the effect to securing his right to just compensation, and not for any affair or property of the state—must, in legal contemplation, be regarded in the same light as that of a trustee for his *cestui que trust*, or of a guardian for his ward. Here then is the assent of one party—the vendor—given by the state. What is the next step? Nothing on his part, but some act on the part of the company desiring to own the land. What is that act? Simply the presentation of a petition to a designated tribunal by the company, asking to be invested with the title to the land in the mode prescribed. This is, when reduced to its elementary form, merely an acceptance by the company of the terms on which the state has declared it may purchase the land. When this petition is filed, the other assent—that of the purchaser—is obtained; and at that moment a contract in solemn and authoritative form is entered into—the state, on the one side, speaking through an enactment—the company, on the other, through its petition; the state, on the part of the owner, agreeing to sell—the company agreeing to buy. From the moment that petition is filed the land and its owner are bound. He can not alienate the land so as to avoid the company's right; he can not seriously impair its value without subjecting himself to the restraining action of the judiciary, if the company invoke it. He can not resist the progress of the proceeding to the conclusion authorized by the law. The right which the company acquires by filing the petition is a vested right; vested in the very commencement of the proceeding, and not capable of being devested if the terms of the law be complied with. It exists only in virtue of its agreement to take the land on those terms. The other party to that agreement is the owner, represented by the state, whose assent the state has already given. This right of the company, viewed in its legal aspect,

is nothing more or less than a right to a specific performance of the state's engagement on behalf of the owner. As this right can not exist, consistently with legal principles, in favor of one party and not in favor of the other, it follows that the owner may equally insist on a specific performance of the company's agreement. Any other view places the owner at the mercy of the company, and renders him liable to interminable vexations; for there is nothing to prevent the presentation of one petition after another, and the dismissing of them, to any extent the company may see fit. The conclusion from the whole argument, therefore, is, that the company had no legal right, after filing the petition, to dismiss the proceeding; and much less after the appointment of the commissioners and the filing of their report and the company's failure to except to it within the time prescribed by the statute, which is equivalent to agreeing to it. This conclusion is in accordance with the tenth section of the charter of the company, which requires that if no valid objection be made to the report within ten days after it is filed "the court *shall* enter judgment," &c. Up to this point the argument has proceeded upon the assumption of an assent by the owner, given by the state for him, and in law regarded as his in effect, whether actually so or not. But this assumption is not indispensable to sustain the position that the filing of the company's petition was a contract on its part to take the land. The law recognizes contracts where the obligor is competent but the obligee is not, and enforces such contracts— as in the case of infants—where they are for the benefit of the obligee. If, in the case in hand, it be held that there was no contract or assent on the part of the owner, still there was a contract on the part of the company in his favor, which the law will, and should, enforce. (The King v. Commissioners, &c. 4 Barn. & Adol. 333 ; The King v. Hungerford Market Co. 4 id. 327 ; Doo v. L. & C. Railway Co. 1 Engl. Railway cases, 257 ; Stone v. Com. Railway Co. id. 375 ; Tawney v. Lynn & Ely Railway Co. 4 id. 615 ; Walter v. Eastern Counties Railway Co. 6 Hare, 594 ; Burkinshaw v. B. & O. J.

Railway Co. 4 Engl. L. & Eq. 489 ; Regina v. B. & O. J. Railway Co. 15 Q. B. 634 ; 4 Eng. Law & Eq. 276 ; Pinchin v. L. & B. Railway Co. 5 De Gex, Macnaughton & Gordon, 851, 864 ; Wilkerson v. Buchanan County, 12 Mo. 328 ; 85 Brit. Stats. at Large, 141, 146.)

II. This proceeding can not be regarded as an action at law or a suit in equity.  It is a special statutory proceeding for effecting a particular object in a prescribed mode.  The court in the execution of the special powers conferred upon it could do no more than the statute under which it acted authorized. The charter of the company did not authorize the court to dismiss this proceeding on the motion of the company ; it could not therefore legally do it, any more than without statutory authority it could render judgment against the company for the damages assessed or decree the land to the company.   (Matter of Beekman street, 20 Johns. 269.)

III. This not being an action at law nor a suit in equity, no appeal lies to this court.  The charter of the company gives no right of appeal, and the general law in regard to appeals—the practice act of 1849—does not reach this case. (Hannibal & St. Joseph R. R. Co. v. Morton, 20 Mo. 70.)

IV. The third section of the act of December 12, 1855, (Sess. Acts, 1855, Adj. Sess., p. ——,) did not confer the right to dismiss the proceedings.  Whatever rights had been previously acquired could not be affected by it.

NAPTON, Judge, delivered the opinion of the court.

This case has been brought here by appeal, and a question has been made whether an appeal lies.  The practice act of 1849 (art. 30, § 6) excludes from its operation all special statutory remedies which, before the passage of that act, were not to be obtained by action at law or bill in equity, and would therefore not seem to apply to this cause ; but in the view we are disposed to take of the matter, it is not very material whether that act or the act of 1845 be considered as applicable.  The practice act of 1845 (R. C. 1845, p. 831) gives this court a supervision by appeal of all judgments and

decisions of the circuit court in civil cases which are final. Whatever form the proceedings in the circuit court in a civil case may assume—whether that of an action at law or a bill in equity, or a motion, or some special mode prescribed by statute—if those proceedings result in a judgment of that court, which is final so far as that court is concerned, that judgment may be reversed upon appeal. A *civil* case, I apprehend, is a phrase used merely to exclude criminal proceedings, for which other and special provisions are made.

Nor is it perceived that the act of 1849 is less comprehensive in its scope. If this proceeding is not one " for the enforcement or protection of private rights, or the redress or prevention of private wrongs," a very restricted meaning must be given to this language, hardly compatible with the general spirit of the law.

That there may be cases where special and limited authority is delegated to a court, not because it is a court, but from some idea of convenience or propriety, and the decision of the court be made final, is not questioned. It may however admit of a doubt whether the legislature could so devise a proceeding designed to effect the transfer of private property to the public, as to deprive the courts of the power of determining whether the constitutional restrictions upon this subject had been honestly complied with. However this may be, the question here is, does the court act in its judicial capacity, and can it exercise, in its control over the subject confided to it by the charter, the general powers and jurisdiction of a court, or is the court, *quoad hoc*, a mere commissioner, a special tribunal selected for a special purpose and *functus officio* when the special powers confided to it by statute have been exhausted ?

The act of 1851 (Sess. Acts, 1851, p. 485), incorporating this company, provides for a voluntary relinquishment of the rights of way desired by the company for their road, and also provides a mode by which the company can acquire a right of way, or a title to the land, in cases where the owner is unwilling to relinquish. In the latter case the proceeding is origin-

North Missouri Railroad Co. v. Lackland.

ated by an application of the company to the circuit judge of the county where the land lies, whose duty it is made, after seeing that due notice has been given to the land owner, to appoint three citizens of the county to view the land and report the damages. This report, when made, is to be filed in the clerk's office, and " if no valid objection be made to such report, the court shall enter judgment in favor of such owner against such company for the amount of damages assessed, and shall make an order vesting in said company the fee simple title of the land." After some further provisions for setting aside the report on certain contingencies, the act provides that, " in all such cases, the court shall adjudge the costs of the proceeding according to equity ; and the court shall have power to make such orders and take such other steps as will promote the ends of justice between the owners of such lands and such company."

There are some provisions in this section which undoubtedly might be construed to limit the power of the judge, as a mere commissioner, to the specific acts delegated ; but in the main the general scope of the section looks to the action of the *court* in its judicial capacity, and gives the court authority, not only to pronounce a judgment which will pass a title to the land to the company and a right to the damages to the land owner, but " to make all orders and take any steps" which in the opinion of the court will best promote the ends of justice. Although the act is carelessly drawn and framed in a mode to justify doubts as to its true intent, we will not presume, notwithstanding the absence of any special provisions for an appeal, that it was the intention of the legislature to deprive the parties interested of this right ; especially as the provisions of the general law, both of 1849 and 1845, seem large enough, without any strained construction, to embrace the case. We are the more inclined to this opinion, because an appeal is the most convenient and least expensive mode in which the supervising jurisdiction of this court can be exercised, and because it may be safely said that it is at least doubtful whether that jurisdiction could be entirely cut off if

the legislature had so intended. Could the legislature pro-vide an illusory compensation for private property taken for public use totally at variance with the true spirit of the con-stitution, and, by placing its enforcement under the control of a selected tribunal and declaring the decisions of that tribu-nnal final, thus place the subject beyond the reach of the courts ?

The principal question in this case is, whether the corpora-tion—after the assessment of damages and the report of the viewers, and before the judgment of the court thereon—has a right to discontinue it proceedings ; and this question will appear upon examination to be much embarrassed, not only by judicial decisions apparently if not really conflicting, but by the intrinsic difficulties of the subject. Considerations of a forcible and practical character might very well have prompt-ed the legislature to have established the rule either way without its being very obvious that injustice would be done. However, our business does not lead us into this branch of the subject, and we are left simply to inquire what the legisla-ture has declared to be the rule in the act under considera-tion, and, if no such declaration has been made, what rule the general law of this state has provided.

In England there is no uncertainty as to the rule. It is well settled by the decisions to which we have been referred, that when railway corporations give notice to a land owner on the route of their railway of their intention to take his land, the company is not at liberty afterwards to retract. In-deed the courts have gone to the extent of holding, that, where a party so situated has received such a notice, he may sustain a bill for a specific performance of the agreement im-plied by the act of Parliament ; and the courts will enforce such agreement by ordering the company to take the proceed-ings prescribed by the statute for ascertaining the amount of purchase money and compensation. (Walker v. Eastern C. R. Co. 6 Hare, 593.) An examination of the British Railway Statutes and the judicial constructions upon them will how-ever show that the system in that country essentially differs

from ours, not only in the principle upon which it is based, but in all the detailed rules by which it is carried out. In England the line of the road is fixed in the charter, and the act is accompanied with a schedule designating all the land through which it passes and its owners or occupiers, so far as their names and the extent of their interests can be ascertained. Contracts for purchase are made before the passage of the act; and those land owners who are upon the proposed line, and are unwilling that their land shall be taken, are heard before Parliament, or its committee who have the subject in charge, and every contested point is adjusted. The act itself effects a sale, the terms of which have been either arranged beforehand or can be ascertained subsequently in the modes pointed out in the law. When the company notifies the dissentient land owner of its intention to take his land, the matter is settled so far as the sale is concerned; and the most exact and careful regulations are made to secure a full indemnity, not only for the value of the land, but compensation for all injuries to portions of land not taken, whether physical and direct or intermediate and consequential. This matter is, in certain cases, submitted to a justice of the peace—in others, to arbitration—and in others again, to a jury selected by the sheriff. In no case is there any appeal; much less can the company withdraw their propositions. It is considered as a forced purchase under the authority of Parliament, and the notice concludes the contract. In addition to this, the company must be prepared to show that their stock has been paid in before they can touch the land.

In this state the course pursued is so totally different, both in system and in all its details, as hardly to require that the points of difference should be particularly enumerated. Railway charters are to be had for the asking, without money and without a route. They are frequently granted ten years before the undertakers are compelled to take the first step either in making a survey or raising any portion of the capital. No line of the route is determined by the charter; for, though a starting point is usually designated, and sometimes

a terminus is also fixed, the line between these points, perhaps hundreds of miles apart, is left to be determined by the interest, convenience or fancy of the company. The counties through which the road is to pass are not even determined, much less the particular tracts of land. The charter of the North Missouri Railroad authorizes the company to build a road from " St. Charles passing up the divide between the tributaries of the Mississippi and Missouri rivers, as near as may be, to the northern boundary line of this state." Here is a scope, varying probably from ten to two hundred miles, within which this company are at liberty to locate their road. Railroads are constructed here, not so much with a view to furnish facilities to existing wealth and population and commerce, as to create them in a wilderness. Hence the subject of damages has not been esteemed one likely to be very important, and has been disposed of in a summary way in a single section—a subject which in England occupies nearly two hundred pages of the statutes and has furnished material for volumes of comments. (85 British Stats. at Large, 141; Chambers and Peterson on Railways.)

It is not easy to determine, from the act which incorporates this North Missouri Railroad Company, at what period the route can be said to be so located as to deprive the company of the power to change. The act gives to the company an indefinite power to " survey, mark, locate and construct" a railroad from St. Charles to Iowa. The act is entirely silent as to how many routes may be surveyed—what shall be considered as binding the company to any particular route—how long they shall be so bound—and how often they may change their selection. It would seem that the power to change a location once determined on is by no means expressly denied, but on the contrary is rather impliedly given. If the company begin at St. Charles and end on the Iowa line, there is no intermediate point determined, except that they are restricted in their selection of a route to that district of country which is denominated "the divide" between the waters of the Missouri and Mississippi rivers; and what acts shall constitute

a location are not specified. By reference to the twenty-third section of the act of 1853 (Sess. Acts, p. 133) it will be seen that the power to change the route is expressly given to the company. The only restriction upon this right contained in that provision is, that where the alteration is proposed in a city or town, it can not be done after the construction of one road unless with the consent of the corporate authorities; and in all cases where an alteration is made after grading has been done on the route first selected, compensation must be made for the injury done to the lands graded. The 56th section of this act declares that "all existing railroad corporations in this state, and such as now are or may be hereafter chartered," shall have all the power and privileges given by the act; and the 23d section is particularly referred to as applicable to all existing corporations, unless their charters contained provisions inconsistent therewith. There is nothing in the 23d section of the act of 1853 at all inconsistent with any provisions of the charter of the North Missouri Railroad Company; on the contrary, as the section is manifestly for the benefit of the company, it may be presumed to have been accepted by the company, and it would seem from this section that until some work is done on a proposed route the company have absolute power to abandon it at their pleasure. What effect such abandonment may have on the rights of others is not provided for or alluded to in the section.

In addition to these obvious marks of distinction between the system of railway enterprises in England and in this country, it may be observed that the principles upon which a transfer of lands from individuals to corporations is effected under the two systems are quite distinct. In England the power of Parliament is exerted to effect a sale, which may be voluntary or involuntary on the part of the vendor, but to which the assent of the vendee is implied by the passage of the charter; and the first step taken by the corporation in pursuance of its charter, to indicate to the vendor that his land will be required, is regarded as completing the contract.

Here there is nothing having the appearance of negotiation and sale ; but the state transfers its powers of eminent domain to the corporation, and authorizes it to take the land desired upon paying the compensation to which the land owner is entitled, and a provision is made to ascertain this compensation. At what period of time the right to the compensation becomes vested and the title to the land is transferred must depend upon a fair construction of the statutory regulations which control the subject here, and but little argument is to be derived from the acts of the British Parliament, or the established practice under them, which, although directed to a common object with ours, are yet based upon different systems and different principles, and controlled by a very different set of circumstances.

In New York the later and more prevalent opinion seems to be, that the company does not acquire any vested or indefeasible right or title to the land sought to be taken, nor the owner any right to the compensation ascertained by the commissioners, until their report is filed and confirmed, and the order of the court made for the payment of the amount. (Hudson River Railroad v. Outwater, 3 Sand. S. C. 691 ; The People v. Brooklyn, 1 Wend. 322 ; In the matter of Canal street, 11 Wend. 154.)

The decisive question in the case is, at what time do the rights of the parties become vested ? Under the charter of the North Missouri Railroad Company, do the rights of the parties become vested upon a notice from the company to the land owner, or upon the appointment of commissioners to view the land, or upon the report of the commissioners, or upon the judgment of the circuit court confirming the previous proceedings in the case ? The language of the act is that " the court shall enter judgment in favor of such owner against such company for the amount of damages assessed, and shall make an order vesting in said company the fee simple title of the land." The court is not authorized to enter a judgment for the compensation against the company until all the preliminary steps pointed out in the act have been

taken; until after a notice has been given to the land owner, commissioners appointed by the judge, a report made by the commissioners, and the report confirmed.   Undoubtedly, if the compensation vested upon any of the preliminary stages of this proceeding, the title to the land for which compensation accrues must have at the same period passed to the company; yet by the terms of the act the court is not warranted in making any order vesting in the corporation the fee simple title to the land until all the previous steps pointed out in the act have been taken.   There is undoubtedly much force in the argument against this construction, based upon the impolicy of permitting these corporations arbitrarily to shift their position, upon the faith of whose stability the individual land owner may have subjected himself to great inconvenience, and other citizens may have invested their means upon the supposed line of the road.   We are fully impressed with the weight of these considerations, but on the other hand the legislature seem to have disregarded them by giving to the company the undoubted right of changing their route up to the very period of commencing their work, and even beyond that, upon certain contingencies referred to in the statute. The legislature may have thought that the public, and the corporation chartered to promote the public interest, would sustain a larger amount of injury by being compelled to abide by its first location in cases where the damages assessed would be esteemed exorbitant and onerous, than individuals would suffer by permitting the corporation in such cases to change the route rather than pay the damages.   At all events we think the fair construction of the charter is, that until the judgment of the court the company has a right to discontinue its proceedings.

The cases in Massachusetts and some adjudications in this court, to which reference has been made, relate to the construction of county or state roads; and there is nothing in those opinions, so far as we have observed, conflicting with the conclusion reached in this case.

In these cases concerning a condemnation of land, the act

provides that the court shall adjudge the costs of the proceeding according to equity. It is obvious that if the company is permitted to discontinue, all the costs and expenses of the land owner should be paid by the company. This will embrace all the costs of the case and counsel fees, both here and in the court where the case was tried.

The other judges concurring, the judgment is reversed and and the cause remanded.

