AUGUST LEISSE et al., Appellants, v. ST. LOUIS & IRON
MOUNTAIN RAILROAD COMPANY, Respondent.

April 25, 1876.

1. The right of eminent domain resides in the State, and may be enforced, not only in behalf of the State, but of any artificial person clothed with a franchise the enjoyment of which promotes a public use.

2. The basis of the enforcement of the right of eminent domain is the necessity for the public use of the property the taking of which is sought.

3. If proceedings are instituted to condemn for public use the property of an individual, and, after the value of the property is ascertained by inquest, the proceedings are abandoned because the price assessed is unsatisfactory, the corporation instituting such proceedings will be answerable to the owner for all damages occasioned by them.

4. Where property against which proceedings to condemn for public use belonged to A and B, co-tenants, who, in resisting the proceedings, employed different counsel, who severally attended to the management of the cause, held, that it was error to permit them to sue jointly to recover damages for counsel fees, etc.

5. In an action to recover damages for the institution of proceedings to condemn private property for public use, money need not have been actually paid out to entitle plaintiff to recover; but, if a debt has been created by reason of such proceedings, a damage has been incurred for which an action will lie.

APPEAL from St. Louis Circuit Court.

*General term affirmed and cause remanded.*

*E. T. Farish* and *F. & E. L. Gottschalk*, for appellants, cited : North Missouri R. R. Co. *v.* Lackland, 25 Mo. 533 ; North Missouri R. R. Co. *v.* Reynal, 25 Mo. 534 ; Hill *v.* Gibbs, 5 Hill, 58 ; Stevenson *v.* Cofferin, 20 N. Y. 151 ; Add. on Torts, 67 ; Twist *v.* Benton, 15 Mo. 619 ; St. Joseph *v.* Hamilton *et al.*, 43 Mo. 282 ; Rogers *v.* Hug, 44 Mo. 116 ; Dill. on Mun. Corp., sec. 474 ; Laughlin *v.* Municipality, etc., 5 La. An. 504 ; State *v.* Grover, 19 Md. 375 ; 31 Pa. St. 19 ; Graff *v.* Mayor of Baltimore, 10 Md. 554.

*Thoroughman & Warren*, for respondent, cited : Sedgw. on Dam. (6th ed.) 125 ; 1 Redf. on Rys. 245, ch. 11, p. 277, *et seq.*

GANTT, P. J., delivered the opinion of the court.

The St. Louis & Iron Mountain Railroad Company, on July 23, 1872, commenced proceedings to condemn the land of appellants, for the purposes of the railroad. Its proceeding was by petition, which alleged that it had become necessary, and the public convenience required, that a branch should be built along said road in the city of St. Louis, from the corner of Convent and Main streets to the northwest corner of block 73, being the intersection of the east line of Fourth street with the south line of Chouteau avenue; and that for this purpose it was necessary for the railroad to acquire the property of the present plaintiffs, Leisse and Lange.

In this proceeding, either by condemnation or purchase, the railroad acquired all the property necessary for the proposed line east of Third street. As respects the property of Leisse and Lange, an award was made by the commissioners appointed by the court, to which the railroad excepted, and the court set the same aside and ordered a new appraisement to be made by a jury. Thereupon the railroad dismissed or discontinued the proceedings commenced to procure the land the acquisition of which by it had been alleged to be necessary for the public use. This was done December 19, 1873.

Thereupon Leisse and Lange, proprietors of the land thus indicated as necessary for the public use, brought their action to the April term, 1874, against the railroad company, to recover damages by them sustained by reason of the proceedings for condemnation. The elements of these damages were that, prior to the institution of the proceedings, the railroad company had given out that it proposed to, and would, locate its road over and across the lot of Leisse and Lange; that, in consequence of this announcement, they were unable " for years to lease, improve, or in any manner use and employ " their land; that they were themselves compelled to lease and rent other property; that, during the pendency of this suit, the said land was virtually condemned, idle, useless, subject to the payment of taxes

by Leisse and Lange, and to the loss of interest on the money therein invested; that, by said proceedings, it was rendered unsalable; that the appellants were put to much trouble, expense, and annoyance by said proceedings; were obliged to fee counsel for about eighteen months, at great cost, and for all this they claimed $10,000 damages.

To this petition a demurrer was filed, assigning as reasons therefor that the plaintiff did not state facts sufficient to constitute a cause of action, and that the petition did not charge defendant with the doing of any unlawful thing or the omission of any duty.

The Circuit Court, in special term, overruled this demurrer. Defendant declined to plead further, and there was an inquiry of damages, after which, due exceptions being saved, the case was taken by appeal to the general term, where the judgment of the special term was reversed.

At the inquiry much evidence was given of the particulars of damage, and the court laid down the following rules for the guidance of the jury:

"The jury are instructed that, in assessing plaintiffs' damages, they may take into consideration, as elements of damage, the rental value of the property from 23d July, 1872, till 19th December, 1873, and the loss, if any, to plaintiffs of rent of said premises during that period, caused by virtue of the proceedings mentioned in the petition; also, the loss of time of plaintiffs necessarily employed in attending court, and giving attention to said proceedings mentioned in the petition; and, also, the expense of counsel or attorneys employed in defending said proceedings."

The railroad company excepted to this instruction, and asked the following, which the court refused, against defendant's exception:

"The court instructs the jury that the evidence shows that the plaintiffs have not paid anything for services of their attorneys in defense of the condemnation proceedings complained of, and that, therefore, in assessing damages in

this case, the jury are not warranted in allowing plaintiffs, on the score of attorneys' fees, more than nominal damages— that is, not exceeding one dollar.

" The complaint of the plaintiffs is for a joint or common injury to them, and the jury are, therefore, directed that, as to any damages sought on account of the several obligations of the plaintiffs for several attorneys' fees, and on account of time spent by the plaintiffs severally in and about the defense of the condemnation proceedings, the plaintiffs cannot recover in this cause, and as to such several injuries the jury are not warranted in taking the same into consideration in making their assessment of damages.

" The court instructs the jury that there is no evidence before them to show that the plaintiffs sustained any actual damage by reason of the institution and prosecution of the proceedings complained of, and that it is the duty of the jury, therefore, to assess nominal damages only to the plaintiffs, or a sum not exceeding one dollar."

There was evidence at the inquest as to the value of counsel fees. It appeared that Leisse had employed one firm and Lange another. These two charged $500 each. The fees had not been paid, but were charged against Leisse and Lange, and they owed them respectively.

Lange testified that the lot was ninety-five feet on Third street by 147 feet on Chouteau avenue, and was held by him and Leisse as co-tenants. Lange was a banker, Leisse was a lumber merchant. The lot was bought in 1869. It was vacant in 1872. The proceedings made the property almost unsalable. The court excluded all evidence of the threats of the railroad company to take the land prior to the actual commencement of proceedings, and the witness went on to say that their commencement hindered the improvement and use of the property, and that when the proceedings were dismissed, in September, 1873, the value of the property was less than it was in July, 1872. It was unsalable in December, 1873. It was in demand in July, 1873, and

before that time. The annual taxes were about $210. Lange estimated his own time to be worth $1,000. The rental (annual) value of the property was from 6 to 8 per cent. of its money value in fee.

Leisse gave similar evidence. The points made for a reversal of the judgment of the general term are :

1. That the petition disclosed a cause of action.

2. That the rule of estimating damages indicated by the Circuit Court at special term was correct.

1. The question presented by the demurrer to the petition is important and interesting. The right of eminent domain is a transcendent right. It is indispensable to the administration of government ; for sometimes the legitimate operations of government may be embarrassed by unreasonable and perverse refusal of individuals to part, on fair terms, with property imperatively needed for public use, and the power to compel such individuals to give up their property, on receiving its fair equivalent, must reside somewhere, or there is danger of an absolute interruption of measures essential to the common weal. So much is undeniable ; but, while the existence and use of this right are admitted to be inherent in the very nature of government, it is not to be doubted that there has been so much oppression and spoliation perpetrated by the abuse of it as to bring the power itself into serious disfavor with unreflecting men.

It is a very trite observation that necessity knows no law, and that its existence is a justification for that to which it compels individuals and society ; but, while this is admitted, the warning is forcibly conveyed to both to be above all things careful to see that necessity, and not some pretense of necessity, actually exists. Our statute books are disfigured by charters conferring upon corporations, which it is difficult to regard as of public utility, this sovereign right of taking private property for a use alleged to be public. Until a recent change in the organic law, courts were not at liberty to go behind the legislative declaration that a use was

public, and inquire whether it really deserved to be so called. Under such a system of laws abuses were natural, and almost inevitable. But it appears to be unheard of under that system for a corporation to be allowed to say that the same thing was necessary or unnecessary, according to the condition of the real estate market. When a piece of property is designated as being in the necessary track of a line of railroad, and proceedings are commenced to condemn it for public use because of its necessity for the promotion of that use, the railroad company (we speak of the law as it stood before 1875) is the sole judge of the necessity, and, if it be content to pay the price which a jury may assess as the value of the property, the owner is compellable to surrender it. It seems wholly inadmissible that the railroad company should be at liberty to declare that a particular piece of property, or a particular series of lots or tracts of land, will be taken as necessary for the location, change, or modification of its line of road; to arrest wholly, by this declaration, any improvement and beneficial occupation of the lots in question; to ruin their market value temporarily at least, perhaps permanently, except with reference to the projected use (all other uses being rendered impossible), and, after an interval more or less protracted, to abandon the proposed line; to say, with all gravity, that the alleged necessity was a loose form of expression, signifying, at most, that it might be convenient to have the property if the price was sufficiently depressed, but that it was not of so pressing a nature as to prevent the present discontinuance of proceedings to acquire the land, the tendency of the price of real estate being downward, and the natural operation of such discontinuance being to depress its value in the particular locality; and that for all this the land-owner should be without recourse on the corporation.

For, let us suppose that six or more lots, which we will call A, B, C, D, E, and F, etc., constitute, in the order indicated, a tract of land sufficient to accommodate a line

or branch line of a projected existing railroad. By the hypothesis the whole of these lots will be necessary to the establishment of the proposed line or branch line, and proceedings are commenced to procure the condemnation of them. A and F are furthest apart, and the others occupy the space between them. To make our meaning clearer and our illustration more pointed, let us suppose that, either by private arrangement or by the proceedings for condemnation, the corporation has acquired all the lots except C and D. Obviously there was no sincerity in the suggestion of the necessity of getting *all* these lots, or, sooner or later, *all* must be had by the road, and, moreover, *all* must be had before the line can be operated at all. This is plain. If the railroad company, after getting the title to all the other lots (A, B, E, and F), can discontinue proceedings as to the other lots, C and D, the owner of them is effectually paralyzed. If he puts any improvement on them, he will be liable to lose it; for, by the hypothesis, he does this in the face of a distinct warning that the land, without any improvement, is imperatively needed for supplying a public want. If he offers it for rent, or attempts to use it for such purposes as do not require the erection of permanent improvements (as, for instance, a lumber-yard, which seems to have been the contemplated use of the lots spoken of in this record), he will be liable, as soon as his lumber is carefully piled—a work of no little labor and expense—to be summoned to remove it at his own cost, because of the recommencement of the proceedings to procure a condemnation of the property Nothing prevents such a recommencement. Every one can see what enormous opportunities are thus given for annoyance and injury to the property-holder; and if we are told that for the actual infliction of this annoyance and injury the law gives no redress, but that the corporation may continue to play this wasting game indefinitely, until the property-holder is completely worn out, we will consider carefully the grounds on

which this extraordinary privilege of mischief is claimed,. before giving it the sanction of our approval.

It is not a pleasant reflection that the exercise of the right,. in whose name these practices are attempted, is far more carefully guarded in Great Britain than in Missouri. The protection of the right of the individual in the enjoyment of his property, against the encroachments, either of the government itself or any corporation to which Parliament may assign—or, to speak more accurately, in whose favor Parliament may exercise the right of eminent domain—is. much more complete in the United Kingdom of Great Britain and Ireland than in the United States of America. The admission may not be flattering to our national pride, but the fact must be borne in mind when seeking aid from the decisions made on this subject in the mother country. We shall, otherwise, be in danger of being misled into the adoption of conclusions flowing from premises quite different. from those which form the basis of our reasoning here.

The general rule in Great Britain is that, when a railroad is projected, not only are the *termini* fixed, but also the line of the intermediate route, before Parliament is called on to decide whether the establishment of such a road will fulfill a purpose of public utility. If this question is decided affirmatively, the proceedings by which are divested the rights of those land-holders with whom the corporation. can make no private agreement are conducted before a. committee of Parliament, and, being once commenced, they can be no more discontinued by the company than the contestants or proponents, in the Circuit Court, of a will which has been admitted to probate or rejected by the Probate Court, can, at their own pleasure, put an end to the steps instituted for the purpose of making proof of the instrument in solemn form. *Benoist* et al. v. *Murrin* et al., 48 Mo. 48. This rule appears far more logical than that. which obtains in Missouri. It seems to be law, here, that such proceedings may be discontinued, at any stage, by the

corporation.   *North Missouri Railroad* v. *Lackland*, 25 Mo. 515.   But the decision in this case asserts an important qualification of the right to discontinue.   Not only does it depend on a change of route, but, when exercised for this cause, certain consequences are regarded as attaching to the corporation.   " It is obvious," says Judge Napton, delivering the well-considered judgment of the Supreme Court, in the case, cited, p. 584, " that, if the company is permitted to discontinue, all the costs and expenses of the land-owner should be paid by the company.   This will embrace all the costs of the case, and counsel fees, both here and in the court where the case was tried."

It does not appear, by the report of the case just cited, whether any damages were claimable by reason of the compelled disuse of the land which the railroad company sought to condemn.   If it was agricultural land, the utmost probable loss to the owner from this cause was that of one year's cultivation; and the fact that the condemnation of the field, or of a line through a field, for a railway track was threatened would not prevent the field being cultivated in the usual mode, up to the time when it was necessary to break ground for the construction of the road.   The attention of the court, in the case in 25 Mo., does not seem to have been drawn to the point made by the appellants in the case before us.   Had it been, we can hardly doubt that it would have been declared that compensation should be made to the land-owner for all costs, expenses, and *damages* occasioned by the proceeding.   We think that such a conclusion is irresistibly implied in the language actually employed by the Supreme Court, and we accept that decision as a guide, in the sense indicated by Lord Mansfield when he said : " The reason and principle of a decision make the law ; *not the letter of particular precedents.*"

We, therefore, think that the actual losses inflicted on the land-owner, by the institution and maintenance of the proceedings to condemn his land, are recoverable when

8

those proceedings are discontinued; and that in the estimate of these losses will be included any loss of rent occasioned by the pending of the proceedings, and the threat of subjecting the property to the use of the road. So long as this threat continues, it is an injury and hindrance to the owner. If the railroad company intends condemning the land at all, it should proceed without delay. If it has abandoned the design, it should say so in an unequivocal manner, and at once.

2. One of the instructions asked by defendant, and refused by the Circuit Court at special term, was that plaintiffs were not shown to have sustained any actual damage by the institution and prosecution of the condemnation proceedings; and one of the grounds assigned in support of the demurrer to the petition was that it did not appear that the railroad company had done anything unlawful. These two matters may be considered together, for they are somewhat dependent the one upon the other.

That the railroad company was guilty of no illegality is not clear to us. It may be admitted that it had the right to appropriate the land of the plaintiffs, for the purpose of making its road, under certain conditions. One of these, of course, was that of paying for it. The other was that the appropriation was necessary to attain the object for which the charter of the road was granted. The term " necessary " has, indeed, been interpreted with what we think laxity by the highest judicial authority with which we are acquainted. In the case of *McCulloch* v. *State of Maryland*, 4 Wheat. 316, the question was whether a national bank was a " *necessary* and proper" agent in the collection, keeping, and disbursement of the public revenue. The counsel for the State of Maryland attempted to confine the term to its etymological meaning, and it is undeniable that this seems to be the natural and true sense of the word. When we say that A is necessary to the existence of B, we mean that, without A, B cannot exist; and, to demonstrate

that B can have an independent existence, will prove that A was *not* necessary. To use a phrase of familiar use, A can be said to be necessary to B only when A is to B a "*conditio sine quâ non.*" But judges whom no lawyer names but to praise, and whose names themselves suggest eulogy, without a dissenting voice, after an argument in which Daniel Webster, Walter Jones, William Wirt, Luther Martin, and William Pinkney had participated, gave a different signification to the word, and held it to indicate such means as might seem to Congress to be "useful, convenient, or essential." All our reverence for Marshall, Story, and Washington is insufficient to make us accept their reasoning or their conclusions on this subject. If ever men could be justified in surrendering their own reason (except on subjects where authority is supreme), they would be pardonable for deferring to the opinions of such sages. But we gravely mistake if, on the occasion instanced, their reasoning was not unsound, and its consequence deplorably mischievous. That it was wanting in logical severity is well illustrated by the four words we have quoted from it, where, by the disjunctive conjunction, "convenient" and "essential" are used as terms of equivalent or convertible import. Without pursuing the distasteful task of criticising this celebrated opinion, we content ourselves with saying that we give an altogether stricter interpretation to the word "necessary;" and, following the reasoning of our own Supreme Court, already cited (25 Mo.), we reach the conclusion that nothing can be said to be necessary to the accomplishment of an object which can be dispensed with without abandoning the object itself.

Now, we are not told that the railroad company has abandoned the design in aid of which it attempted the condemnation of plaintiffs' property, and it is uncontradicted that it has acquired a considerable part of the land over which its new track was intended to pass, but has stopped short of acquiring the rest, which belongs to plaintiffs.

It seems to us that one of the following propositions must be true, viz. :

(1.) The whole design originally contemplated has been abandoned, and so none of the land named in the condemnation proceedings is now necessary to the railroad company ; or,

(2.) The original design is still cherished, but the acquisition of plaintiffs' property is not, and never was, necessary to its accomplishment ; or,

(3.) The original design is still cherished, and plaintiffs' land is necessary to its accomplishment, but the temporary discontinuance of the proceedings is a tactical operation likely to lead to the acquisition of the title of plaintiffs' property on easier terms, at some early day—the value of the land for all other purposes being greatly impaired by the imminence of its appropriation for the use of the railroad.

We can think of no other hypothesis.

The first supposition seems opposed to all the facts before us ; and, if it were admissible, it would follow that there was no necessity, in any proper sense, for the establishment of the new branch line.

If the second supposition be the true explanation, it results, of course, that the appropriation of plaintiffs' land was not necessary in the first instance ; and, in respect of the third, it is enough to say that the railroad company could not be heard if it attempted such a definition of its action.

But the conclusion is that the land of plaintiffs was confessedly or demonstrably *not* necessary for the railroad ; and, if so, it has no justification, under the law, for the steps which have caused such loss to the plaintiffs. Hence it cannot be said that the corporation has done nothing beyond what the law permitted it to do. It would be more precise to say that, under cover of lawful right, it has attempted something which the law sanctions only in a case the existence of which, by its own conduct, it has precluded itself from asserting.

3. The respondent asked the court to declare that the plaintiffs could not, in this action (that is, suing jointly), recover damages for liabilities incurred by the separate retainer of counsel by each of them in defense of the condemnation proceedings, or for their several loss of time in attending to the business of that defense.

The evidence was uncontradicted that one of the plaintiffs retained Messrs. Gottschalk, and the other Messrs. Bakewell & Farish. These retainers were separate and independent. There were no joint retainers, and no joint responsibility in respect of professional services rendered. The time and attention bestowed by each plaintiff on the defense of the suit were also in no sense joint. It is hard to imagine any such thing as sameness of time and attention. The plaintiffs are not partners, nor is there any community between them, except in respect to the ownership of the land. That they were entitled to equal compensation for loss of time, etc., or for liability for counsel fees, is unlikely ; but, if true, would be to no purpose. The rule is that, for all injuries to the realty, or all claims for occupation of the realty, tenants in common must join. *Lane* v. *Dobyns*, 11 Mo. 105, which established a doctrine contrary to that asserted in Chitty on Pleading, 75, 76, where it was laid down that " tenants in common *may join or sever* in such actions." And, hence, it was not only permissible, but necessary, that plaintiffs should sue jointly for the loss of rent occasioned by the condemnation proceedings. But they must sue separately for their several and unconnected claims for counsel fees and loss of time. This instruction should have been given, and, for its refusal, the decision of the court at special term was properly reversed at general term. It is possible that this was the only error which the Circuit Court, at general term, intended to instance. It is quite consistent with the record before us that such was their view.

4. Another instruction asked by the railroad company,

that the plaintiffs could only recover nominal damages in respect of counsel fees incurred but not paid, was properly refused at the inquest. The plaintiffs are liable for these fees, and in any event are compellable to pay them. There is no analogy between the case before us and that of a covenantee who sues his covenantor for breach of a covenant against incumbrances. It is quite possible, until covenantee has paid these, that he may never be made to pay them; and he is under no original liability to pay them. He would merely discharge them to protect his land, and there may be reasons why he would elect not to do this.

The judgment of the general term, reversing the judgment of the special term, is affirmed, and the cause is remanded for further proceedings in conformity with this opinion. Judge LEWIS concurs; Judge BAKEWELL, having been of counsel, does not sit in this case.