**STATE, ex rel. KILLEEN REALTY COMPANY et, Relators, v. EAST CLEVELAND (City) et, Respondents.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 24549. Decided October 8, 1958.

Arter, Hadden, Wykoff & Van Duzer, for relators.

Baskin, Kelley, Lausche & Heavilin, Stanley G. Webster, Director of Law, for respondents.

## OPINION

By SKEEL, PJ.

This action, seeking a writ of mandamus, is one in which the original jurisdiction of this court has been invoked. The relators are the owners of the fee and their lessees of a tract of land comprising about five acres, which for the most part is undeveloped. This tract has a frontage of 381 feet on the north side of Euclid Avenue beginning at the northeast corner of Euclid Avenue and Eastham Avenue in the City of East Cleveland. The first 100 feet, fronting on Euclid Avenue, measured easterly from said corner, having a depth of about 185 feet, is now occupied by an old obsolete type gasoline station on the front with a parking lot in the rear. This parcel is zoned by the Zoning Ordinance of the City of East Cleveland under Class U-4 (commercial-light industrial district). The remaining frontage of 281 feet on Euclid Avenue is about 673 feet deep, running back to the Nickel Plate Railroad right of way. The last described Euclid Avenue frontage is zoned for Class U-3 (retail district) for a depth of 140 feet and the balance is zoned for Class U-2 (apartment house usage).

The respondents are The City of East Cleveland, The Board of Zoning, Building Code and Fire District Appeals of The City of East Cleveland, The Commission of East Cleveland and Malcolm S. Douglas, Building Inspector, City Engineer and Secretary of the Board of Zoning Appeals who is vested with authority, upon application, to issue building permits.

The action seeks a decree or an order of this Court (in mandamus) directing the respondents to issue or cause to be issued to the relator, The Killeen Realty Company, a building permit for the construction of a supermarket on the most southerly 450 feet of the parcel with 281 feet of frontage on Euclid Avenue, which, as above set out, the front part to a depth of 140 feet, is zoned for retail business and, the rear part, of about 533 feet, is zoned for apartment house use.

The petition of the relators alleges that the Board of Zoning, Building Code and Fire District Appeals is created by the charter and ordinances of said City and is authorized to grant variances (to the provisions of the Zoning Ordinance) in the size and location of the use districts in hardship cases. (U-1, U-2, U-3, U-4, and U-5.) The petition further alleges that the Commission, consisting of five members, is the duly constituted legislative body of the City created by the charter and vested with authority to amend or repeal the provisions of the Zoning Ordinance of the City and to affirm, amend, modify or reverse any decision of the Board of Zoning, Building Code and Fire District Appeals.

The petition then sets out in further detail the property known as the Walworth Tract which is the subject of this action. This tract contains about five acres, is undeveloped except for two very old houses located, as shown by respondents' exhibits, in an otherwise almost completely developed neighborhood containing buildings which are at the very least twenty-five to thirty-five years old. The Walworth Tract includes, in addition to the acreage above described, a forty foot lot (Sublot No. 11 of the Doan Subdivision) running from its westerly side through to Eastham Avenue, located some five hundred feet north of Euclid Avenue, which lot is zoned for "Commercial—light industry"— U-4, as is all of the property bordering on the west boundary line of such tract, including the 100 x 185 foot parcel at the northeast corner of Euclid Avenue at Eastham Avenue described above.

It is alleged that sometime shortly prior to March 22, 1956, the respondents informally considered a proposal of The Killeen Realty Company to use the property fronting on Euclid Avenue east of the 100 foot parcel to a depth of 320 feet for a supermarket, which proposal provided off-street parking for 161 automobiles. Such project would have required a variance or extension of the zoning of the Euclid Avenue frontage for retail use (U-3) from the present depth of 140 feet to a depth of 320 feet. Further, The Killeen Realty Company was on said date advised that it had been informally agreed upon by the Board of Zoning Appeals and the Commission and that a change of the balance of the property to a U-4 use would be favorably considered. It is further alleged that within a few days, the relator, The Killeen Realty Company, was informed that the City had decided against the use of the Euclid Avenue frontage for a supermarket and suggested "that a commercial or light industrial use of the Walworth Tract be found." It is alleged that though constant effort had been expended, no such use has been found except a proposed sale of the south west corner to a "major oil company" for a gasoline station.

It is alleged that in December of 1957 and January 1958, the City of East Cleveland was again informally requested to permit the construction of a supermarket on the front part of the Walworth Tract, the market building (134 x 160 feet) to be located some two hundred and fifty feet north of Euclid Avenue with off-street parking for 220 automobiles. It is alleged that such request, with location drawings, was presented at regular hearings before the "Board of Zoning Appeals" and thereafter to the "Commission" and that such request was refused by both agencies.

It is alleged that the refusal of the City to either amend its Zoning Ordinance to permit the retail use of the Euclid Avenue frontage of the Walworth Tract to the depth of 450 feet or 310 feet beyond that which is now provided for retail purposes or to grant a variance to that extent, for the construction of a "supermarket," when considered in the light of the tract as it is there situated and the surrounding uses and circumstances, is unreasonable, arbitrary, capricious and unlawful in that such action bears no substantial relation to the general welfare, health and morals of the inhabitants of the City in the vicinity of the Walworth Tract.

It is further alleged that because of changed conditions since the zoning of the northerly five hundred and thirty feet of the Walworth Tract for apartment house use (U-2), the zoning having been passed in 1922, and not since changed, which property as thus zoned is without a street entrance except on Eastham Court, has a U-3 or retail use completely across its Euclid Avenue frontage, is bounded by a railroad on the north, faces the rear walls of old apartments in a solid line within three feet of its border to the east, and to the west, borders property zoned for industrial use (U-4). It is further alleged that such required use (U-2) is now not economically possible, and that to refuse to permit a variance by extending the retail zoning of the Euclid Avenue frontage sufficiently deep to permit its use for a supermarket, such use being one of necessity and benefit to the surrounding residents, is unreasonable, arbitrary, capricious and a taking of the relators' property without due process and, therefore, unconstitutional.

The answer of the respondents by its first defense admits the corporate capacity of the corporate parties and the official capacity of the Boards, Commissions and officers of the City of East Cleveland who have been made parties hereto, but denies that all of the Walworth Heirs, owners of the fee of the property involved, made John W. Walworth their agent or that The Killeen Realty Company is the lessee of such property. The answer further admits the location and the classes in which the several parcels of the property here concerned are zoned under the provisions of the Zoning Ordinance of East Cleveland. It is also admitted that prior to the regular meeting of the "Board of Zoning Appeals," on April 1, 1958, a request to enlarge (either by declaring a variance or change in the zoning of the "Walworth Tract"), the U-3 use of a depth of 140 feet from Euclid Avenue north sufficiently to accommodate the building of a supermarket with facilities for off-street parking of about two hundred automobiles was made by the relator, The Killeen Realty Company, which application was rejected by the Board, and upon appeal to the Commission, such rejection was affirmed. It is also alleged that the relators made application to the building inspector for authority to proceed with preparations of plans, and specifications as required by the Building Code for the construction of said supermarket but that the inspector denied his power to grant such request because the building of a supermarket on property partly zoned for U-2 (apartment) uses was prohibited by the zoning ordinance.

It is alleged that the Zoning Board of Appeals, in refusing to recommend to the Commission the rezoning application of the relators or to grant their application for a variance, did not act unlawfully, capriciously, unreasonably or arbitrarily nor were the relators' constitutional rights violated and that in requiring relators to adhere to the zoning restrictions as applicable to its property, they, the relators, were not subjected to practical difficulties or unnecessary hardships and for such board to grant relators' application would constitute exercising legislative authority contrary to their powers as provided by the Zoning Ordinance.

The answer then described the "Walworth Tract," except for the

Euclid Avenue frontage, as in a predominantly residental area and described the extent of the U-2 zoning thereabouts and the development of the surrounding property in accord therewith and alleges that relators' property, which is zoned for U-2 purposes, is desirable for apartment house or residential development.

It is also alleged that the development of the said property for supermarket purposes would create increased traffic problems dangerous not only to the traveling public but also to children traveling to school. It is finally alleged in respondents' first defense that relators' property can be profitably utilized for the purpose for which it is zoned and that the provisions of the Zoning Ordinance restricting relators' property to a U-2 use is reasonable and constitutional.

The respondents' second defense is that there is a defect of "party relators" in that all owners in fee simple of the Walworth Tract are not parties to the action. The respondents' third defense alleges the provisions of the Building Code which require the filing of plans and specifications before a building permit can be applied for and alleges that there is provided administrative procedure by which an unsuccessful applicant can appeal to the Board of Building Code Appeals and to the Commission in the event of a refusal of the building inspectors to issue a permit, with which administrative requirements the relators have failed to comply.

By reply the relators put in issue all allegations of the respondents' answer controverting the allegations of the relators' petition or such as are intended to state an affirmative defense.

The issue presented by respondents' claim that the relators failed to carry out administrative procedure and that this action is, therefore, prematurely brought, must be decided against the respondents. While it is quite true that complete plans and specifications were never prepared or filed with an application made to the building inspector for a building permit, as required by the Building Code, the record is abundantly clear that to have done so would have been to perform a useless act. Until the zoning on relators' land had been changed as requested or a variance allowed, as provided by the Zoning Ordinance of the City, the building inspector was not legally authorized to issue a building permit for the construction of a building in violation of the then existing zoning limitations. The record is also clear that a request for a variance or amendment to the Zoning Ordinance was presented first to the Board of Zoning Appeals and upon its refusal to act, then to the Commission, where relators' demands for relief were likewise refused. In both hearings, relators' claims were heard on the merits so that any deviation from administrative procedures or requirements cannot now be asserted as a defense in this action.

We come, therefore, to the two principal claims of the relators. First, in refusing to grant a variance by extending northerly the right to use the property for retail purposes for a distance of about 310 feet from that portion of the relators' land fronting on Euclid Avenue, which is now zoned for U-3 uses, did the administrative agencies, having such matters in charge, commit an abuse of discretion? As a matter of

law was an unnecessary hardship created in the literal application of the zoning restrictions as to the use of relators' property?

Second, did the refusal to amend the Zoning Ordinance as it applies to relators' "Walworth Tract" by extending the U-3 use, now provided for as to the Euclid Avenue frontage, to a depth of 140 feet, to a total depth of 450 feet, such change clearly being necessary for the successful use of such property for a specific retail business, constitute a taking of such property without due process, resulting in its confiscation?

In considering these questions, attention will be directed first as to whether the relators' claims should be considered as seeking a variance as defined by the Zoning Ordinance of the City of East Cleveland. The Zoning Ordinance of East Cleveland provides (Sec. 38.400) "The Board of Zoning Appeals shall determine all matters properly presented to it and where practical difficulties and unnecessary hardships shall result from the strict compliance with or the enforcement of the provisions of the Districting or Zoning Ordinance, the Board of Zoning Appeals shall have the power to grant variances in harmony with the general intent of the ordinance and to secure the general welfare and substantial justice in the promotion of the public health, comfort, convenience, morals, safety and general welfare of the City of East Cleveland."

Sec. 38.500 provides: "The Commission of the City of East Cleveland shall have the power to approve, amend, modify or reverse any decision of the Board of Zoning Appeals if the City Commission finds that the decision of the Board of Zoning Appeals is contrary to the purpose and intent of the provisions of the Districting or Zoning Ordinance."

Sec. 39.100 gives the Commission of East Cleveland as the legislative body of the City the power and provides the manner in which it shall act in amending or repealing any part or all of the Zoning Ordinance of the City.

These sections demonstrate that the Board of Zoning Appeals is authorized to grant variances to provide relief in every case of practical difficulty and unnecessary hardship in which the facts justify such an order, the orders becoming final unless appealed to the Commission. Under Sec. 38.500, supra, only the Commission has power to amend the Zoning Ordinance.

In Hopkins v. Board of Appeals (1942) 178 Misc. 186, 33 N. Y. S. 2d 396, it is "observed, in this connection, that the distinction between a situation which calls for legislative relief by an amendment of the zoning ordinance rather than quasi-judicial relief at the hands of a board of appeals by granting a variance of the zoning regulation may in some instances be very narrow; that it may depend upon whether the changes brought about by the years have been such as to render the zoning restrictions ill-adapted to an extended area surrounding and including the premises in question, or to bear with especially injurious effect upon such premises alone, or upon such premises and a few others similarly situated; and that it may also depend, without regard to the extent of the area affected, upon whether undue hardship or practical difficulty results from the premises having become obsolete for

their former purposes without any reasonable possibility of their being adapted to other conforming uses except at such risk as to render it impractical as a business venture." (168 A. L. R. 23) Van Meter v. H. F Wilcox Oil & Gas Co. (1935) 170 Okla. 604, 41 P. 2d 904.

It seems from the above and the following cases that the distin-- guishing factor between a variance and an amendment is whether the conditions which create the hardship relate primarily to the particular property for which the variance is desired as distinguished from conditions which create hardships of a similar nature to all property owners in the same area. In the former case, the granting of a variance is proper, in the latter, relief must be by amendment to the zoning law.

The view stems naturally from the very purpose for authorizing the granting of variances. As was stated in **Investment Co. v. Cutler (1932), 125 Oh St 12, 21,** and quoted in State v. Gunderson (1936), 198 Minn. 51, 268 N. W. 850:

"Manifestly the legislative body cannot fix any adequate standard or rule that would fit every individual case of hardship. That is impossible: and therefore the legislative body has confined the determination of that feature to an administrative agency . . . as a fact-finding body which could determine whether in any specific case unusual hardship might result if the strict letter of the ordinance were complied with."

South Bend v. Marckle (1939) 215 Ind. 74, 18 N. E. 2d 764; Brandon v. Montclair (1940), 124 N. J. L. 135, 11 A. 2d 304; (affirmed in 1940) 125 N. J. L. 367, 15 A. 2d 598.

In the case of Indianapolis v. Ostrom Realty & Constr. Co. (1932), 95 Ind. App. 376, 176 N. E. 246, it was held that the board of zoning appeals did not have authority to rezone "an entire city block" under the guise of a variance.

The owner's plight must be due to unique hardships not to those suffered in common by other owners of property in the same area. Brandon v. Montclair, supra, Levy v. Board of Standards, 267 N. Y. 347, 196 N. E. 284, Brackett v. Board of Appeals (1942) 311 Mass. 52, 39 N. E. 2d 956.

In People, ex rel. Arverne Bay Constr. Co. v. Murdock (1936), 247 App. Div. 889, 286 N. Y. S. 785 (affirmed without opinion in 1936, 271 N. Y. 631, 3 N. E. 2d 457) the court said, in denying a variance: "Under these circumstances there was no showing of unnecessary hardship or practical difficulty applicable peculiarly to the site in question, and relief, if any, should be achieved through appeal to the legislative authority which created the zone." See Matter of Clark v. Board of Zoning Appeals (1950), 301 N. Y. 86, 92 N. E. 2d 903.

In the case of Nelson v. Donaldson, 50 So. 2nd, 244, 255 Ala. 76, Supreme Court of Alabama (1951), the court sustained an order of the "Board of Adjustment" granting a variance in a case where the Zoning Ordinance was found to create a hardship in its literal application to the property of the appellee. Headnote No. 4 provides:

"Statute enumerating powers of municipal boards of adjustment, and authorizing upon appeal any variance from terms of ordinance as will not be contrary to public interest, where, owing to special com-

missions, a literal enforcement of ordinance will result in unnecessary hardship, properly empowers boards of adjustment to determine that in a particular situation a zoning ordinance should not be applied literally and to that end board may make proper adjustment to prevent unnecessary hardship, even to extent of authorizing nonconforming uses."

If, therefore, the physical facts now surrounding the relators' property. with which we are here concerned, show clearly that progress has passed it by, such being the case if zoning restrictions have created a lack of street ingress and egress and, in a real sense, locked it in from reasonable access and made its use for apartments unrealistic; if, in fact, added restrictions imposed by the city on that part of the property zoned for retail purposes by requiring off-street parking, off-street loading docks, set-backs and rear yards, has destroyed the usable value of that part of the property fronting on Euclid Avenue for retail purposes unless enlarged sufficiently by extending the rear line of the 140 foot strip zoned for retail purposes back sufficiently to take care of these new requirements imposed by the City; and if the hardships thus created apply only to relators' property and a variance will in no way detract from the value and use of the property there about, it must follow that a failure to grant a variance to relieve such property from these hardships and practical difficulties thus existing would constitute an abuse of discretion because of which courts, in a proper action, will grant relief.

The west line of the Walworth Tract borders the east line of the Doan Subdivision, recorded in 1904. The Doan Subdivision included Eastham Avenue and the lots on the east side of such street and two lots facing Euclid Avenue, the latter two lots being the property on which the gasoline station and the parking lot, above described, are situated. This entire subdivision is zoned for U-4 or commercial use and has been since 1922. The Norton-Doan Subdivision comprises all the land from Eastham Avenue west to Doan Avenue running from Euclid Avenue north to the Nickel Plate right-of-way. All of the property in this subdivision and that of the Cleveland Rapid Transit Terminal, beginning on the west side of Doan Avenue and extending several hundred feet westerly, running from Euclid Avenue north to Hayden Avenue, is zoned, and has been, since 1922 for U-4 or industrial use. There are a number of industrial establishments now located in these subdivisions, two of them on land bordering the Walworth Tract.

There are two streets, in addition to Eastham Avenue, in the Doan and Norton-Doan Subdivisions; first, Elderwood Avenue, which is forty feet wide, unimproved, and running east from Doan Avenue to Eastham Avenue about five hundred feet north of Euclid Avenue, the southside of which is occupied by three separate industries; (This street is about two hundred seventy feet long), and second, Eastham Place, 22 feet wide, running east from the north end of Eastham Avenue, somewhat south of the Nickel Plate Railroad right-of-way, to the Walworth Tract, a distance of 100 feet; whether this alley is improved or not, is not clearly brought out.

That part of the Walworth Tract east of the Doan Subdivision has a frontage of 281 feet on Euclid Avenue and is 673 feet deep running back to the right-of-way of the Nickel Plate Rail-

road. The right-of-way at this point is fifteen feet above the level of the ground and is situated on an artificial fill. The rear line of relators' tract along the railroad right-of-way is twenty feet below the Euclid Avenue frontage, most of the fall occurring on the most northerly five hundred feet of the tract. The easterly line of the Walworth Tract runs from Euclid Avenue north to the railroad right-of-way along the rear and averages three feet from the rear walls of almost a solid line of three story apartments facing on Wymore Avenue to the east. As above stated, the original Zoning Ordinance of East Cleveland, passed in 1922, zoned that part of this tract east of the first 100 feet from Eastham Avenue (which is zoned U-4 or commercial use), for U-2 or apartment house use, except the Euclid Avenue frontage, to a depth of 140 feet which is zoned U-3 or retail use.

From this description, it is to be noted that the only street access to that part of the relators' property zoned for U-2 use is Eastham Place, a 22 foot court near the railroad tracks in the extreme northwest corner of the property. The City of East Cleveland owns a lot fifty feet wide running from the most westerly end of Elderwood Avenue, at its intersection with the north end of Wymore, to the Walworth Tract. This part of Elderwood Avenue runs east from Wymore to Shaw Avenue, a distance of several blocks. The City acquired this lot in October of 1924 by deed reciting that it was to "be used for street purposes only." No attempt has been made by the City to dedicate and improve this lot for street purposes but instead, it has leased it as a parking lot. The City explained this use of the lot as being due to insufficient off-street parking space in the U-2 development from Wymore Avenue east to Northfield Avenue, nor the Euclid, which territory has been solidly developed with three story apartments with only a negligible amount of off-street parking provided.

Whether the owners or lessees of the Walworth Tract could ever depend on this lot as a means of ingress or egress is open to considerable doubt. The officials of the City indicated that they would not now favor a street outlet at this point. The Vice Manager and Finance Director, when asked if there had been any consideration given to the use of this outlet for traffic from the proposed supermarket and why such suggestion was rejected, said:

"I was speaking only for myself, and speaking personally. It was rejected because we felt, or I felt, that Elderwood Avenue, Wymore Avenue and Page Avenue were very congested streets due to the fact that we permit all night parking because of inadequate garage facilities and that to throw—that there were—I recall that we mentioned that there were a great many children in that area, young children, and that to throw any considerable volume of traffic, additional traffic, via the Wymore lot into this area would, in my opinion, be a hazard to safety."

In spite of this testimony of the respondent (the Vice-Mayor), one of the respondents' expert witnesses, in presenting a proposed use of that part of relators' property which is zoned for U-2 or apartment house purposes without disturbing the Euclid Avenue frontage zoned for U-3 uses, proposed the use of this lot as the principal outlet for garden-type apart-

ments. This drawing also showed the use of the 22 foot alley on the west side of the property as the only other means of ingress and agress. Both of these proposed outlets are near the railroad embankment and the only approach or access to Euclid Avenue was some 500 feet south, either down Eastham or Wymore Avenues. Who would dedicate this land for street purposes and provide the necessary improvements is not found in any of the calculations of the cost of developing apartments presented by respondents in attempting to show such development as a practical use of the property.

There are other factors of significance to be considered in giving consideration as to whether or not the refusal of the Board of Zoning Appeals and the Commission to grant a variance to the relators by extending the U-3 zone on the Euclid Avenue frontage of the Walworth Tract north a sufficient distance (310 feet) to permit the construction of a supermarket with adequate off-street parking, constituted an abuse of the exercise of its discretion in dealing with this property. Setback ordinances and an ordinance passed since the 1922 Zoning Ordinance, providing for rear yards and off-street parking and loading zones or spaces, now limit the use of this retail frontage. The ordinance of the City of East Cleveland now provides for a seven foot setback for buildings on Euclid Avenue. There must also be a rear yard where the U-3 use district adjoins a Class U-1 or U-2 district which rear yard shall be equal to 10% of the mean depth of the lot or as applied to this property, it would require a rear yard 14 feet in width. One off-street unloading space, which must be within the setback distance of any street and not a part of the space used for off-street parking, is likewise required, which space shall be not less than 10 feet wide, shall have a clearance of 14 feet and shall not be less than 45 feet in length, exclusive of aisles and maneuvering space and main driveways. A retail establishment must also provide off-street parking places. One 10 foot wide and 20 foot long space, exclusive of driveways, must be provided for each 200 square feet of gross floor space used in such business. These provisions severely limit, if in fact they are not totally destructive of, the use of this property for retail purposes because of the limitation in depth. They would require much of the Euclid Avenue frontage to be used as a parking lot.

It should be pointed out that changes in the depth of Euclid Avenue frontage devoted to retail trade beyond the 140 foot limit, probably for the reason just suggested, are not an infrequent occurrence in the City of East Cleveland. Of the 27,900 feet of Euclid Avenue frontage in the City of East Cleveland, the zoning map shows that on 10,585 feet of such frontage the U-3 use extends beyond the 140 foot limit. The notations on the zoning map frequently disclose the business conducted where the boundaries of the U-3 use have been thus extended. The word "tourist" on such extended depth appears five times on the south side of Euclid Avenue from Lakeview Avenue to Superior Avenue. Many funeral homes, auto agencies and sales lots, a shopping center, a medical center, and a restaurant will be found clearly indicated along the way. In addition, 2425 feet of the Euclid Avenue frontage, located in widely

separated places and extending back for more than 140 feet in most cases, is zoned for U-4 commercial use. The use to which such property is put is noted as auto sales agencies, service stations, coalyards and the like. These facts show that there has been no clear-cut policy or a rigidly enforced rule dealing with the depth of the retail districts along Euclid Avenue.

The respondents plead and rely heavily on two factors in justifying the refusal of relators' request. First, there are sufficient grocery establishments to take care of the needs of the people thereabouts and if the relator is allowed to become competition, some of the smaller businesses will suffer and, second, a supermarket located on Euclid Avenue at the place indicated would create a traffic problem.

As to the first of these contentions, it must be clearly stated that zoning laws or ordinances cannot be the basis of limiting competition. There is no legal foundation for such a claim. A municipality has no constitutional power to control who shall engage in the common businesses of a community. Only when a business is affected with a public interest and by reason of which regulation is necessary for the common good, does the state have a constitutional right to license or control business operations. This claim will not be dignified by further discussion.

Nor can a city use zoning ordinances as a primary means of regulating traffic or in attempting to reduce traffic congestion. To attempt to prevent a property owner from engaging in a lawful business because his customers come to deal with him in an automobilue, thus adding to the flow of traffic, is unrealistic. Legislative bodies have attempted to meet this problem by requiring those who come anew to the retail enterprises of a street to provide "off-street parking" for their customers. The courts have given complete support to such requirements as a reasonable exercise of legislative power clearly within constitutional limits. It is quite another matter, however, to say that, while the customers of merchants who established themselves prior to the requirement of off-street parking may cause traffic congestion by parking on the street. the newcomer shall not be allowed to engage in business even though he furnishes off-street parking because the ingress and egress of his customers from his off-street parking facilities will cause traffic congestion.

Off-street parking is not a new question. Of interest only historically is the case of Rex v. Cross, 3 Camp, 224, 170 Eng. Rep. 1362 (1812), in which Lord Chief Justice Ellenborough stated:

"And is there any doubt that if coaches, on the occasion of a rout, wait an unreasonable length of time in a public street, and obstruct the transit of his Majesty's subjects who wish to pass through it in carriages or on foot, the persons who cause and permit such coaches so to wait are guilty of a nuisance? In measuring out the punishment, the court would examine whether the act was repeated, and what degree of public inconvenience was experienced. But every unauthorized obstruction of a highway to the annoyance of the King's subjects, is an indictable offense. Upon the evidence given, I think the defendant ought clearly to be found guilty. The King's highway is not to be used as a stable-

yard. It is immaterial how long the practice may have prevailed, for no length of time will legitimate a nuisance. * * * A stage-coach may set down or take up passengers in the street, this being necessary for public convenience; but it must be done in a reasonable time; and private premises must be procured for the coach to stop in during the interval between the end of one journey and the commencement of another. No one can make a stableyard of the King's highway."

In Yokley in Zoning Law and Practice (1953), it is said in Vol. 2, page 76:

"While traffic is not the moving factor in the drafting of zoning ordinances, most comprehensive zoning ordinances now make some provision for the proper programming of present and future traffic improvements. It has been found that this can best be done through the medium of off-street parking requirements for certain classes of buildings and structures."

The constitutionality of such zoning ordinances, i. e., requiring off-street parking, is supported in the case of McSorley v. Fitzgerald, 359 Pa. 264, 59 A. 2d 142. While the case does not directly have to do with zoning, it discusses at length the whole problem created by increased usage of automobiles and traffic congestion. At page 145 of the opinion, the court says:

"Those attacking the constitutionality of such a law as that which is here under consideration obviously labor under the mistaken notion that its purpose is merely to cater to the convenience of the owners and operators of motor vehicles; * * *; its real purpose is to promote the larger and more general good of the community by freeing the streets of the impediments and perils arising from dangerous and often intolerable conditions of traffic congestion; * * *, its justification stems directly from the exercise of the police power, which is the supreme power of government."

The question being considered was whether a Parking Authority had the right to exercise the power of Eminent Domain. The decision was that it did because its primary objective was the relief of traffic congestion, which was for the public welfare, in that traffic could then flow more freely in a less hazardous manner. By analogy, a zoning ordinance being within the exercise of the police power, the provisions regulating off-street parking are constitutional. Similarly, in the case of City of Chicago v. McKinley, 344 Ill. 297, 176 N. E. 261, syllabus 5 holds:

"Determination of city council as to means for removing causes of traffic congestion cannot be disturbed, unless means adopted are unreasonable."

Concerning traffic hazards the court in Huntley Estates, Inc. v. Town of Eastchester, 121 N. Y. S. 2d 504 at 508 (reversed on other grounds) said:

"When, however, the defendant's witnesses attempt to justify, even in part, the zoning of Plot A on the basis of traffic bottlenecks or traffic hazards, the Court must divert from their opinions. Even though it finds that * * * form a traffic bottleneck and that zoning Plot A in other than Residence A will create additional traffic on Mill Road, it cannot

sustain the ordinance on that score alone. Traffic problems are in the domain of police and not zoning authorities." (Citing Brooklyn Parking Corp. v. Cannella, 193 Misc. 811, 85 N. Y. S. 2d 389.)

In City of Syracuse v. Bronner, et al., 133 N. Y. S. 2d 153, syllabus 3 holds:

"Fact that there was a great deal of congestion in traffic around corner where business was located would have no bearing on right to conduct business as a nonconforming use under zoning ordinance; traffic congestion being a matter for police regulation rather than a concern in enforcement of zoning ordinance."

In Reed v. Borough of North Wales, 83 Mont'g. 69, at 76, cites Township of Lower Merion, et al v. Frankel, 64 Mont'g 14 at page 33 (Pa. cases) "that traffic increase in itself is not a compelling factor to be considered in a zoning case."

The record here discloses only that traffic congestion might be caused under conditions which have not yet been demonstrated to be true if ingress and egress to and from the relators' proposed off-street parking area be permitted. Certainly if off-street parking can be justified as a necessary safety measure enforced by the exercise of the police power of the city, a business which provides such safe protection to the public should be preferred over a business that does not provide for off-street parking. It will probably always be true that the concentration of traffic on Euclid Avenue will require expert handling, which, in truth, is the job of the traffic expert, and not the Board of Zoning Appeals or any other authority of the city authorized by law to zone property uses. The record shows by traffic count that traffic on Euclid Avenue was considerably less at the time of the trial of this case or just prior thereto than was true in 1955 when an application for a use of the property (Pick-N-Pay), similar to the present one, was before the zoning authorities of East Cleveland. The explanation suggested by the City's experts was that employment in the great industrial area on Euclid Avenue just beyond the easterly limits of the City of East Cleveland was down because of the business recession. While, in' part, this may be true, yet the development of throughways and other restricted access highways may also explain the reduction in the traffic count. Certainly the great expenditure of money to take through traffic from the business thoroughfare of cities will in the near future leave such streets as Euclid Avenue to serve the business interests of the community, and the problems which motivated the zoning authorities of East Cleveuand to refuse relators' request will become non-existent. It may be just a coincidence but in examining all of the pictures of Euclid Avenue at or near the relators' property, received in evidence, some showing an expanse of several blocks while others portrayed only a part of a block (14 pictures in all, 5 of the pictures taken at about noon), only two vehicles in motion are to be found therein. The record also shows that sometime during the consideration of an application to change the zoning on the Walworth Tract in 1956, City Officials, after refusing such application, based largely on traffic congestion, suggested that it might be possible to find some light industrial use for the property. It is,

therefore, made to appear that if the City were willing to permit light manufacturing uses to be made of the property, a lower grade use than U-3, the basic reason for not permitting a supermarket was the supposed effect of such business on traffic. There is no evidence in the record that would justify a refusal of relators' request based on traffic problems that may be created by the proposed supermarket. If traffic congestion were the primary basis for the refusal for granting the variance, such action would, in fact, constitute an abuse of discretion.

The second question, that the refusal to grant the variance constituted a taking of relators' property without due process of law, is well taken. The location and present status of the property and its surroundings have been clearly set out. The feature of its limited access calls for consideration. The unwillingness of the City to provide ingress and egress through the city owned lot at the end of Elderwood Avenue to the east, although the lot was acquired for that purpose, seems difficult to understand. The zoning map in evidence shows that Elderwood Avenue parallels Euclid Avenue and extends east as far as Shaw Avenue. With its extension through the relators' property, which extension is now easily available, to connect with the westerly part of Elderwood (a plan that must have motivated the purchase of the lot on Wymore for street purposes), providing a direct approach to the rapid transit, would be available and off-street parking could be provided, which would eliminate the congested condition of Wymore Avenue, Page Avenue and Elderwood Avenue, as described by the city's traffic expert. It would also eliminate the locked in effect of one of the respondents' proposed plans for using the property behind the 140 foot strip zoned for retail business for apartment purposes by providing reasonable access thereto. In all events, without adequate access to the relators' property, zoned for apartment purposes, its use for apartment purposes is greatly restricted. A property owner is not required to use his property more favorably zoned, contiguous to his more restricted property, to make the latter available for the use to which the City has restricted it, particularly when the boxed in condition in effect is primarily the result of the zoning ordinance and the refusal of the City to open up a city-owned natural outlet because it permits parking on the streets beyond.

The evidence establishes the relators' contention that when the use for which the property is zoned (U-2 use), is considered with regard to its restricted use and the surrounding circumstances, the provisions of the Zoning Ordinance, as applied to this particular property, constitute a taking of such property without due process. One of the contributing factors to this conclusion is to be found in the respondents' expert witnesses' testimony of the cost of the development of the property and its contemplated income. The witness testified that the old apartments to the east had a rental income of $75 to $85 per month and that vacancies were frequent and that the income from his proposed apartments, providing comparable space, would be from $90 to $120. It would be unusual if a small new development, sandwiched between an industrial area, a railroad, a retail district, and the back walls of old apartment houses, without reasonable access, could compete by a twenty-five per cent higher rent with available lower priced suites on the streets

in the same vicinity. It is the judgment of this court, from the evidence in the record, that the relators' property, zoned for U-2 use, or apartment purposes, as it is now situated, is not reasonably available for that purpose and the restriction as to it is unreasonable and confiscatory.

We further conclude, for the reasons more fully hereinabove set out, that the refusal of respondents to grant a variance extending the depth of a U-3 zoning of the Euclid Avenue frontage of relators' property (The Walworth Tract), into the U-2 use zone, as prayed for by the relators, to make sufficient land available upon which to build a supermarket, where it is made to appear that because of restrictions of the Zoning Ordinance now applicable to U-3 use, which restrictions now require setbacks, rear yards, unloading docks and off-street parking, that such land within the 140 foot depth of the frontage now zoned for retail purposes is, by reason of such restrictions and the surrounding circumstances, insufficient, and the extension of such retail zone is necessary to the reasonable use of the property and where the conclusions of this court are that the property zoned for U-2 use into which such variance will extend, is not now economically available for the use for which it was zoned, it being "locked-in" and without reasonable ingress and egress caused by the terms of the Zoning Ordinance and subsequent development, and where the granting of such variance will not adversely affect the surrounding property or the safety, morals, health and general welfare of the people, such refusal constitutes an abuse of discretion from which the relators' are entitled to relief.

For the foregoing reasons, a writ is granted ordering respondents to issue to the relator, The Killeen Realty Company, a building permit to occupy to a depth of 450 feet its Euclid Avenue frontage in the "Walworth Tract" for a supermarket upon compliance with all Building Code Regulations.

HURD and KOVACHY, JJ, concur.