## THE MAYOR AND CITY COUNCIL OF BALTIMORE ET AL. *vs.* THE CHESAPEAKE AND POTOMAC TELEPHONE CO. ET AL.

*Right of a Telephone Company to Lay Conduits in Streets of Baltimore City—Construction of Ordinance—Duty of the Telephone Company to Remove Poles and Wires From Streets Having Conduits—Injunction Not Granted When Applicant Has Not Complied With Contract.*

When a telephone company is authorized by ordinance to construct conduits in the streets of a city in consideration of the removal of its overhead poles and wires from such streets, the Court will not interfere by injunction to enforce the right of the company to lay conduits in new streets until it shall have removed its poles and wires from the streets where conduits have already been made.

In 1889 an ordinance of the Mayor and City Council of Baltimore, being Ordinance No. 41 of that year, authorized the Chesapeake and Potomac Telephone Company to construct conduits under the surface of the streets of that city in which to place their wires, provided that three miles of such conduits should be constructed within two years from the passage of the ordinance, and that after said two years and as rapidly as the wires should be laid in the conduits all poles of the company along such streets should be removed, except in so far as poles may be necessary to make distribution of, and form connections with, wires laid in conduits. The company laid conduits under the ordinance in the central part of the city. When it sought to extend the system, it was held on former appeals that this ordinance and its acceptance by the company constituted a valid contract binding upon the city and that the company is entitled to lay its conduits in other streets subject to the regulations of the City Commissioner. The telephone company afterwards applied for a permit to construct conduits in certain designated streets, not in the central portion of the city, and upon its refusal by the municipal authorities filed the bill in this case asking for an injunction to restrain interference with such work. The answer of the city alleged that the right was granted to the company upon certain conditions, among others that the company would remove its poles from the streets as rapidly as the conduit system was extended, and that since the company had failed to comply with this provision of the ordinance it is not now entitled to ask for an extension of its conduit system *Held*,

1st. That the ordinance does not impose upon the telephone company the obligation to construct underground conduits in every street where it furnishes telephone service.

2nd. That under the ordinance the obligation was imposed on the company to remove its overhead poles and wires from the streets where the conduits had been constructed, except those poles which may be necessary for the purpose of making distributions to houses and forming connections with wires in the conduits.

3rd. That the company is not entitled to maintain poles for house distribution in such streets after a feasible underground system therefor has been devised, but the company must adopt the new system, so as to carry out the purpose of the ordinance.

4th. That the evidence in the case shows that in streets where conduits are laid, poles are no longer necessary to make connections with houses on those streets or with overhead wires on adjoining streets, and that the cost of an underground system therefor is not too great to make it impracticable in streets where many telephones are in use.

5th. That in the central and congested part of the city where such new system is practicable the company should remove all its poles from the streets, and until that shall be done the Court will not interfere by injunction to enable the company to construct new conduits in other parts of the city.

Appeal from a decree of the Circuit Court of Baltimore City (WICKES, J.), granting an injunction (upon bills, answers, replication and testimony) prohibiting upon the terms set forth in the decree the city authorities of the city of Baltimore and the Police Department from preventing the construction, by the appellees of conduits for telephone wires in certain named streets in the city of Baltimore.

Ordinance No. 41 of 1889, referred to in the opinion of the Court is fully set forth in 89 Md. 691–694.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Wm. Pinkney Whyte* and *Olin Bryan* for the appellans

*Arthur W. Machen* and *Bernard Carter* for the appellees.

PAGE, J., delivered the opinion of the Court :

These parties have been twice before this Court—once in 89 Md. 689, and again in 90 Md. 642. It is unnecessary for the consideration of the questions involved in this appeal, to refer to these cases further than to say that by the first, it was

held that Ordinance No. 41 created a valid and subsisting grant which, having been sanctioned by the Legislature of the State, the Mayor and City Council are powerless to destroy or change; and that by the second, the telephone companies having complied with the terms and provisions of Ordinance No. 41, were entitled upon the case as then presented, to an injunction against the interference by the city with the construction of its conduits, subject, however, to the right and power of the city to adopt reasonable regulations, etc.

After the cause was remanded for the second time the city, through its counsel, filed a supplemental answer, and it is conceded the only questions now before us are those which arise upon the issues it tenders. The substance of the supplemental answer may be thus briefly summarized. The defendants allege: 1st. That the Ordinance No. 41, if accepted as a contract, "was based primarily upon the consideration, that the telephone companies, for the privileges granted, were to remove within the period of two years from the date of the approval of the ordinance" as rapidly as conduits were constructed and cables laid therein, all poles under their control standing upon any street along which any conduit is constructed and cables laid; and that said poles should not be replaced, except in so far as such poles "are necessary," for the purpose of making distribution of and connection with the wires "forming part or parts of any such cable;" 2nd. That the complainant companies "have not removed any of the poles," but to the contrary, "they have to-day in fact more poles in the city along the same streets and alleys where their conduits have been laid, than they had at the time of the passage of the ordinance;" 3rd. That the primary consideration upon which the privileges set out in the ordinance were granted was to obtain the removal of the overhead wires; yet the complainants have not performed their part of the contract, by failing to remove such poles, it being "now well settled" that no poles or overhead wires are necessary for distribution or for house to house connection where conduits are laid, and that 4th, the complainants having thus failed to perform its

contractual obligations, and in fact having violated the contract in letter and in spirit, cannot now undertake to ask the interference of the Court to protect them against the action of the city authorities in refusing to permit them to lay further conduits.

It is proper to state that it appears by the map filed among the proceedings that all of the conduits referred to in the bill and mentioned in the petition to the City Commissioner lie beyond the central part of the city and are not within those districts, which were called by the counsel at the argument the *"congested"* parts of the city. The counsel for the city at the argument stated also that the city did not insist that the companies should, under the terms of the contract, be required to remove all the poles in streets devoted to residences and where many wires were not required; but only in the central or business parts of the city, where many telephones are used, and therefore many wires required; that the requirements of the contract, as well as of public interest, demand that the companies should remove all poles in the "congested" parts of the city, it being proved that the distribution from the conduit by poles has now become obsolete and entirely unnecessary. The contention thus presented involves the inquiry whether the companies have performed the obligations imposed on them by the ordinance, and if they have not, whether notwithstanding, they are entitled to the relief prayed for in the bill.

As to the latter branch of the inquiry, it cannot be questioned that when the companies asked the intervention of the Court to enable them to enjoy the privileges of the contract, it is incumbent upon them to show that they have performed everything that the contract requires to be done on their part. This follows from the application of a plain principle of equity, that one party shall not be bound when the other is not bound, and is a well-settled rule of equity. *O'Brien* v. *Pentz*, 48 Md. 562; *Duvall* v. *Myers* 2 Md. Ch. 402.

It being incumbent, therefore, for the appellees to show, that they have performed what they agreed to perform, if it should appear that they have failed to remove such poles as by a

proper construction of their contract they had agreed to re-move, they would not be in a position to ask the intervention of the Court to enable them to exercise further privileges under the ordinance.

The main question in this case therefore is, what is the duty of the companies with respect to the poles used for distribution from wires forming parts of the cables in the conduits; and that depends upon the construction to be given to the contract with the city, as contained in ordinance No. 41. It requires merely a casual glance at the words of the ordinance to show that the ordinance confers upon the telephone companies exceptional privileges and powers, the exercise of which must interfere with rights of the public in and to the ·streets of the city. They are authorized to dig up as much of the bed of the steeets, alleys or highways of the city, as may be required for the construction of their conduits under the surface, take possession of the space so occupied and use it at their pleasure. And this valuable right, they can enjoy in perpetuity without interference from the municipal authorities, and to the entire exclusion of the public. The ordinance therefore confers upon the companies exceptional privileges and powers for their own benefit and advantage, which interfere to an important extent with the authority of the municipality to control its own streets. In such cases, it is a settled rule of construction that the contract must be construed strictly, and if there be found words in it capable of various meanings, that interpretation should be adopted which will best conserve the public interests. This principle-is so conformable to reason that it can scarcely be necessary to cite authority, but in order to show how it has been applied a few examples will be given. In the case of the *Atty.-Genl.* v. *The Furness Co.*, 47 L. J. Ch. Div. 778, the Vice-Chancellor said: " They (the railway company) have a statutory right to exercise the powers which have been given them. But then they must be held to the strictest exercise of those rights." In *Fenwick* v. *East London Railway Co.*, 20 L. R. Equity Cases 549, the question arose as to the right of the railway company to erect a

mortar mill close to the place of business of the plaintiff, who complained of the injury and annoyance occasioned by the vibration, &c.   The Railway Clauses Act gave them power to do all " other acts necessary for the making, &c., of the railway " provided they shall " do as little damage as can be." The Master of the Rolls in construing this Act, after citing from LORD CHIEF JUSTICE COCKBURN in *Reg.* v. *Wycombe R. Co.*, Law R. 2 Q. B. 320, that, " we are not to look at the convenience of the company alone, but to the accommodation and convenience of those who have rights of property which are interfered with, of those who have immediate access to the road or who use it of necessity in the ordinary course of business," said it was on this principle that the Act must be strictly construed.   See *Endlich on the Interpretation of Statutes*, sec. 354 and cases there cited.   Also *Moran* v. *Commrs.*, 2 Black 722; *Baxter* v. *Tripp*, 12 R. I. 310; *Burbank* v. *Fay*, 65 N. Y. 57; *Lewis* v. *Weston*, &c., L. R. 40 Ch. Div. 55; *Sanderson* v. *Cockermouth, &c., Ry.*, 11 Beav. 497.

Bearing these principles in mind, we come now to the examination of the provisions of the ordinance.   It was not controverted at the argument that the object of the ordinance was to remove from the streets as far as possible the great and increasing number of overhead wires.   How to secure that end had even in 1889 become a serious problem, and it had become obvious also that in the not far distant future the system of overhead wires would be attended with grave perils to persons and property, and would greatly disfigure the appearance of the streets.   Firemen had already found it dangerous and otherwise difficult to contend with fires ; and though telephone wires do not carry a sufficient voltage to make them dangerous to human life, it was obvious that sometimes the wires becoming detached and coming in contact with electric light or railway wires or other wires carrying a greater voltage would prove a source of peril to persons passing along the highways. In addition to this, in the "congested" parts of the city, the hundreds of wires crossing and recrossing each other in apparently inextricable confusion, formed objects most unpleas-

ing to the eye and offensive to the sensibilities.   To get rid of this objectionable system, without curtailing the conveniencies of almost every class of persons in the use of the telephone, the Ordinance (No. 41) was enacted.   By its provisions the city, in consideration of the prospective removal of overhead wires from the street, agreed to accord to the companies certain privileges and powers therein mentioned.   That this was the purpose of the Act, we think, appears not only from a consideration of the external circumstances existing at the date of its passage, but also from a consideration of the preamble.   It is there expressly stated that the exchange in said location "will necessarily require, if the overhead system is wholly continued," a large and increasing number of overhead wires along the length of the streets and other public ways leading to said building, and such a concentration at a point so central as the location of said building is not desirable, and it would be to the public advantage that such wires should be laid in cables underground, &c.   Now, even rigidly construed, this seems to be that these companies being about to locate their new buildings in a central position in the city, where doubtless there were already many other overhead wires, it would be desirable to have such wires as were to be concentrated in the new building in cables underground. Such a disposition would not dispose of all overhead wires, but would inaugurate a system by which finally all wires would be taken off the street.   The word "*wholly*" upon which the appellee's counsel laid so much stress, refers, it would seem, not to the wires of the telephone company only, but to any other wires that might then be on those streets or might thereafter be placed there by other persons.   It was not, therefore, expected that the arrangement with the companies would remove all the wires on the street, but it would at least inaugurate a system which would eventually result in the removal of all overhead wires.

Now, what were the character and limitations of the privileges granted by the ordinance?   The companies were authorized to lay in suitable conduits under ground such wires

as were to be used in connection with the new telephone exchange, and "to make necessary house connections in localities where the same may be required, in such manner as may be best adapted to the location, by means of any wire or wires from such cable or cables." By the second section, the companies are required to construct at least three miles of conduit within two years from the passage of the ordinance, and "after said two years and as rapidly as said conduits may be constructed, and said cables are laid therein, all poles belonging to or under the control of either of said companies standing upon any street or thoroughfare in this city along which any such conduit is constructed and cable laid, shall be removed, and shall not be replaced, except in so far as such existing pole or poles now standing or hereafter to be maintained or erected by such companies or company are necessary to be maintained or erected by them or it, for the purpose of making distribution of and forming connections with any wire or wires forming part or parts of any such cable so laid in a conduit, with the building or buildings or place or places intended to be connected with such wire or wires from such cable." There is nothing in this section, or in any other, that deprives the companies of any right theretofore belonging to them to extend their system by means of overhead wires ; nor does the ordinance impose upon them the obligation to remove their poles anywhere, except those upon streets, alleys and thoroughfares along which their conduits are constructed and the cables laid. The language employed is imperative in imposing upon the companies the obligation to build at least three miles of underground conduits within two years from the date of its approval, and thereafter they are to remove as rapidly as possible and not to replace all poles on the streets upon which the conduits are constructed. This duty to remove poles is, however, subject to the exception by which they are not required to remove such of their poles, then standing or hereafter erected by them, as are "necessary" "for the purpose of making distribution and forming connections" with the wires constituting parts of the cable in the

conduit. It is clear by this clause that the companies are not bound to remove such poles as " are necessary " for distribution ; that is for making house to house connection along the street where the conduit is laid, and also for making connection with wires on poles located on other streets. The counsel for the companies admit that the poles thus to be permitted to remain, are those only that are "reasonably required" for distribution. The words of the exception are, such as " are necessary to be maintained or erected by them or it, for the purpose of making distribution of and forming connections with," &c. It is insisted, that inasmuch as the mode of distribution by poles not only to subscribers on, but to subscribers off, the line of the street was the method in use in 1889, when the ordinance was passed, that it was comtemplated, and the contract must be understood to mean, that the companies are bound only to make distribution by poles. But to this contention we cannot agree. The word " necessary," in the connection in which it is used, we agree with the appellee's counsel, must be understood as authorizing such poles as are " reasonably required " for the purpose of distribution. But how must this be understood ? The word " necessary " must be construed in the connection in which it is used. It is a word susceptible of various meanings ; it may import absolute physical necessity, or that which is only " convenient or useful or essential." *McCulloh* v. *State*, 4 Wheaton, 413. In the case just cited CHIEF JUSTICE MARSHALL said, the word " has not a fixed character peculiar to itself. It admits of all degrees of comparison." In the present case, the object of the ordinance was to get rid as far as possible of the overhead system. To secure that end, as far as was then practicable, the companies are authorized to lay conduits and place cables in them. At that date the only method in use for distribution from wires laid in cables, indeed the only method, and therefore the only method that could then " reasonably be required," was a distribution by poles. But the ordinance did not contemplate that the use of poles as to numbers and locations should be only such as would suit the convenience or

profit of the companies. They were limited to the use of such only as were necessary or "reasonably" necessary for that purpose. Nor could the intent have been that the distribution by poles should always be employed, no matter what the improvements of advancing science may have brought about. If such had been the intention, it would have been easy to have so stated. Instead of that, however, the clause in question grants the right to maintain poles on the street where the conduit is laid, upon the condition of reasonable necessity, and when no such necessity exists, they must remove the poles. It would be doing violence to the clear intent of the Act, to hold that the companies might retain obsolete plans, when such plans would go far to defeat the purpose for which the ordinance was passed. If this were true, the whole purpose for accomplishing the extinction of the overhead system would prove a dismal failure. The cost of the new system is undoubtedly to be considered, as matter of fact, in determining whether it is reasonable that the companies should adopt it; but in itself it affords no argument in the construction of the ordinance. In *Fenwick* v. *East London R. Co.* (*supra*) the Court said: "The company may buy mortar anywhere but it may be cheaper and more convenient to them to make the mortar at this place. * * * But we are not to look at the convenience of the company alone, but to the accommodation and convenience of those who have rights of property which are interfered with." The purpose of the ordinance was not to save the companies expense but to accomplish a public end, and while exact justice must be done, we should not permit the consideration of cost to the companies to be of such weight as to force such a construction of the contract as will seriously and injuriously affect the public interest. *Lewis* v. *Weston*, 40 Ch. Div. 55; *Sanderson* v. *Cockermouth*, 11 Beav. 497; *Moran* v. *Commrs.* 2 Black 722; *Leisse* v. *St. Louis and Iron Mtn. R. R. Co.*, 2 Mo. App. 105. As long, therefore, as the only feasible plan of distribution was by poles, the companies were authorized under this contract, to use that system. But when a system which does not involve the reten-

tion of poles along the streets in which conduits are laid was devised, by which the old method of distribution was not necessary, and such new plan is feasible, and such as in all respects can reasonably be required of the companies, then, under their contract they cannot adhere to the old system, but must adopt the new, so that the objects and purposes of the ordinance shall be carried out.

Without prolonging this opinion, we may say that the evidence in the case, convinces us that poles on the streets where the conduits are laid are no longer necessary to make connection with houses on the line of that street, nor with overhead wires on the adjoining streets.   As to the latter, connection may be made by underground methods, to poles standing elsewhere than on the street where the conduits are laid.   In New York, Chicago and St. Louis, the distribution, at least in the " congested" portion of the city, is made without the use of poles.   The expert witnesses who were examined agree that in the construction and maintenance of such a system, there is no mechanical difficulty.   It is objected by the companies that the cost would be so great as to render the system impracticable.   But we do not think the testimony sustains this.   There are great differences in the calculations made by the officers and agents of the companies and those made by other persons who have testified,   But there is little division of opinion as to the entire feasibility of underground distribution in the " congested" parts of the city either as to cost, construction, or physical difficulties of every kind actually existing.   As the proof shows that the companies still retain poles in the " congested " parts of the city, that is in those parts where the houses are close, and many telephones are in use, we will not pursue the question of cost further.

Our conclusions are, that Ordinance No. 41, 1st, does not impose upon the companies any obligation to construct underground conduits in every or any street along which it desires to furnish telephone service.

2nd. That they are bound to remove *all* poles along the streets where the conduit is constructed and the cables laid.

3rd. Except such poles as are necessary for distribution.

4th. That there is a new system of distribution not calling for the use of poles feasible as to cost and mechanical construction where many telephones are in use.

5th. That in the " congested " parts of Baltimore City, the new system is practicable and reasonable and all poles therein along the streets containing the conduits, should be removed, before the Court will interfere to secure the right to the companies to make further extensions of their privileges under the ordinance.

> *Decree reversed, with costs and cause remanded.*