# LUCKY STORES, INC. *v.* BOARD OF APPEALS OF MONTGOMERY COUNTY ET AL.

[No. 100, September Term, 1973.]

*Decided December 5, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*John J. Delaney,* with whom were *Linowes & Blocher* on the brief, for appellant.

*Stephen P. Johnson, Assistant County Attorney,* with whom were *Richard S. McKernon, County Attorney, Alfred H. Carter, Deputy County Attorney, Stephen J. Orens* and *John B. Walsh, Jr., Assistant County Attorneys,* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

The appellant, Lucky Stores, Inc., which operates Memco Department Store ("Lucky Stores" or "Memco"), presents two questions for resolution by us, *i.e.*, (1) whether Section 59-124(f) of the Zoning Ordinance for the Maryland-Washington Regional District in Montgomery County [1] (the Zoning Ordinance), providing, in relevant part, that the appellee, Board of Appeals of Montgomery County (Board), before granting a special exception for a gasoline filling station, find "from a preponderance of the evidence of record that for the public convenience and service a need exists for the proposed use for service to the population in the general neighborhood considering the present availability of such uses to that neighborhood" is unconstitutional by denying Lucky Stores due process of law and the equal protection of the laws and (2), assuming the constitutionality of that provision, whether the Board, in the present case, had a reasonable basis to support its denial of the special exception requested by Lucky Stores.

The Board denied Lucky Stores' application for the special exception on November 9, 1971; and the Circuit Court for Montgomery County (Moorman, J.) affirmed the action of the Board in a well-considered, written opinion and order filed April 6, 1973. A timely appeal to us was taken by Lucky Stores from this order.

We have concluded that the lower court ruled correctly and we will affirm its order of April 6, 1973.

Memco is the operator of a discount department store located on an 11.31 acre tract of land on the west side of Rockville Pike, south of Rollins Avenue, zoned C-2, General Commercial. On April 29, 1971, it filed with the Board a petition for a special exception to use a portion of the tract for the construction and operation of an automobile filling station. The proposed filling station was to be a part of a

---

1. As codified in the 1972 edition of the Montgomery County Code and in the current Zoning Ordinance, but referred to by the lower court in its opinion and by the parties in their briefs as Section 111-36f of the prior Code of Montgomery County.

large "one-stop" shopping center constructed on part of the tract, consisting of a department store, pharmacy, food store and a tire, battery and accessory (TBA) center, all of which, except the filling station, has been completed during the progress of the present litigation and is in operation. The total investment in the facility, including the improvements, is approximately $3,000,000.00.

A public hearing was conducted by the Board on September 9, 1971. Memco's first witness was David Waddell, Director of Memco's Eastern Operations. He testified that Memco owns and operates 27 shopping facilities on the West Coast and in Arizona, similar to the two stores it owns and operates in Virginia and the two in Maryland. He described the general layout of the shopping center and explained that a "one-time lifetime membership fee of $1 for the entire family is charged as a prerequisite to shop. The proceeds of these fees are devoted largely to charitable and scholarship foundations administered by local community leaders to be spent in the areas the stores are located." He stated that the "sale of gasoline at TBA sites is an important part of the business program" and that, in his opinion, "there presently exists a valid commercial need for this additional business privilege." He further testified that gasoline is an essential commodity necessary for a one-stop shopping concept. Mr. Waddell stated that the proposed filling station would be open from 7:00 a.m. to 10:00 p.m. daily and from 9:00 a.m. to 5:00 p.m. on Sundays. He further stated that 80% of the filling station patrons would be membership customers, already on the premises, shopping at the Memco facility. Neither of the two Memco stores presently operating in Maryland has a filling station connected with it. The one in Fairfax, Virginia, however, does have a filling station. He stated that his estimated gallonage for the proposed filling station, based on the averaging of the existing stores, would be from 90,000 to 100,000 gallons a month.

Memco's next witness, Ron Polniaszek, a registered architect, explained the site plan for the proposed filling station, pointing out that it would have four parking spaces based on the number of employees that work at the filling

station and describing the type of signs to be installed and the lighting to be used. He stated that the filling station "is located in an area of cut on the site, it has a berm of 12 feet average which is connected all the way across 12 feet. You really cannot see the filling station itself from Rockville Pike as you are traveling southbound. . . . The filling station itself is arranged in such manner it cannot be seen from the Rockville Pike." There are to be no signs facing Rockville Pike that identify the filling station. He further testified in regard to the availability of utilities and the access to the site, stating that there would be no overburdening of existing public facilities resulting from the proposal.

Memco's next witness was Stanley Hatfield, a design engineer who is the manager of the construction engineering division of DiGas Corporation, which is responsible for the design, engineering, and operation of the proposed filling station. Based upon figures taken from a typical week in August, 1971, at the Fairfax Memco Store, he stated that "between 80-82 percent of the traffic into the Memco filling station will come from traffic already on the department store premises." He pointed out that "only 4 percent of the service station's business is done on Sunday, the day the main Memco store is closed."

In regard to the need for the proposed filling station, Mr. Hatfield testified:

"It is a fair question to ask why, in view of the numerous other existing filling stations in the area along Rockville Pike, there is a need for Memco to provide gasoline to its customers. The answer to this question is basically twofold:

"a. Part of Memco's overall service to its customers is a complete 'one-stop' shopping service, including groceries, clothing, prescriptions, appliances, and complete automotive services, including a tire, battery, and accessory store, and gasoline. These services are being provided at virtually all of Memco's 27 stores throughout the country and have helped to create a national image of the store as a complete one-stop shopping center.

"b. More importantly, we offer a service which is unique insofar as comparing a Memco facility to those of major oil companies and other independent operators. First of all, Memco appeals to a different clientele from that which patronizes the major oil stations. *As you know, most people who carry a Shell, Standard, Texaco, Gulf, or other major oil company card are generally not inclined to trade at other locations. These persons, we have found, do not normally utilize Memco's services.*" (Emphasis supplied.)

He also stated that Memco furnishes "full service station services" while others "such as Giant, Hess, Scot, etc., do not . . . ." He was of the opinion that the freestanding filling stations of the major oil companies are "highway-oriented" whereas 80 per cent of the Memco service station customers are persons who came to the Memco store to shop generally and not primarily for gasoline. "Only 20 percent of the Memco station patrons visit the station alone and these persons are not likely to have made a special trip for this purpose." He was of the opinion that the Memco operations "neither conflict with nor draw away from other free-standing major oil company stations," and this opinion was confirmed, he stated, by the experience at other Memco filling station sites, giving specific data in regard to the Fairfax Memco site.

Mr. Hatfield was of the opinion that the proposed filling station would not cause a nuisance because of noise, odors, or physical activity and would have no adverse effect on traffic.

Board member O'Brien then asked Mr. Hatfield:

"MR. O'BRIEN: Why do you feel Rockville Pike needs another gas station?

"MR. HATFIELD: We feel *Memco as such for its complete operation needs it to serve its members.*

"MR. O'BRIEN: I think the ordinance says a clear and present need must be demonstrated. I assume

that meant the public. *Why does the public need a new gas station* on Rockville Pike?

"MR. HATFIELD: It *completes our one-stop shopping complex* which is a national advertised program.

"MR. O'BRIEN: Do you think that is your fullest answer on that?

"MR. HATFIELD: Yes." (Emphasis supplied.)

Mr. Hatfield further stated that he knew "there are quite a few service stations [on the Rockville Pike]. I also know there are again the major oil company stations which derive most of their traffic from the highway, and ours which we again hope to bring our traffic from our membership on the lot." He testified that Memco would sell its gasoline three to five cents per gallon cheaper than the major oil company stations. Giant Food Store provides a similar discount, but does not provide the full services Memco expects to provide.

Memco's last witness was Stephen G. Petersen, a traffic, planning, and engineering consultant. He was of the opinion that "the service station will have a minimal traffic impact and will not cause increased hazard on the adjacent roads," giving detailed figures and data to support that opinion.

Five witnesses appeared in opposition to the granting of Memco's petition for the special exception. The first witness was Jack Hoffmeister, Chairman of the Greater Washington Service Station Association Zoning Committee. Other members of this committee were William Crouch and Dick Wilson. They "discussed and interviewed most of these 25 service station dealers in this Rockville marketing area." The Rockville marketing area "is 3.8 miles from Randolph Road to Dodge Street at the tip of the inner city of Rockville." Mr. Hoffmeister had prepared a chart, which was admitted into evidence, showing the locations of the 25 stations in the Rockville marketing area. This exhibit shows that there are four filling stations at the intersection of Rockville Pike and Rollins Avenue. On the southwest corner (adjoining the Memco tract) is the Bill Crouch Texaco station; on the northwest corner is the Dick Wilson Shell station; on the southeast

corner is the Captain's American station; and on the northeast corner is the Adams Gulf station. The Johnson Shell filling station is a short distance to the south of the Captain's American filling station and is directly across Rockville Pike from the Memco tract. Still farther to the south on the east side of the Rockville Pike is the Super Giant Shopping Center.

Mr. Hoffmeister stated that the Rockville marketing area is "a heavy automotive oriented area in which we have . . . 25 service stations with three tire service stores, six auto dealerships, three auto specialty shops which are Midas, Aamco, and Sure-Fit, and two car washes." He added that a new Finnegan gas-car wash, consisting of three pump islands having six pumps per island, would open in the near future and be a high volume outlet. He further stated that within the marketing area there were seven brands and two unbranded (Gem and Giant) stations from which the public could currently purchase gasoline.

Mr. Hoffmeister conducted a survey by sending a questionnaire to the 25 filling stations in the marketing area, requesting answers from them. He received replies from 10 stations and considered this to be satisfactory and the tabulations "credible" because of the representative nature of the replying stations. From this survey — which covered the calendar years 1969, 1970, and 1971 — he calculated that the gallonage for the marketing area service stations shows a 12% *decrease* for the year 1971. The peak year for gallonage was in 1970. This decrease, in his opinion, was "because of increased service stations in Montgomery County in this area. On our chart we have two Esso's that have been built, opened in the last year." He also pointed out that during this period, Maryland gasoline taxes increased 5% so that it would be reasonable to expect a 5% *increase* of sales of gasoline in the marketing area, but instead there was a *decrease* in volume of gasoline sold in the marketing area. He also observed that there were "discount operators" already in the marketing area, *i.e.*, Giant and Gem.

The next witness for the opposition was Mel Lipkin, the General Manager of the Gem Department Store on Nicholson Lane (to the south of the Memco site). He testified

in regard to Gem's discount operation (four to five cents less per gallon) and indicated that the Memco and Gem operations were "very similar" and "in fact we are almost parallel." He stated that Gem was not operating at its maximum capacity and was "[c]apable of doing more [gasoline business]."

William Crouch next testified. He is the operator of the Texaco station located at the southwest corner of Rockville Pike and Rollins Avenue, "right next door" to the Memco tract. He testified that his station was capable of doing more business. He had calculated his gallonage trend for the past two or three years and concluded that there was a downward trend beginning approximately January of 1971. For example, last summer his filling station was pumping approximately 78,000 to 79,000 gallons, but "this year [1971] we are down to approximately 66,000." He testified that the public had no difficulty in obtaining service at his station or at the other stations in the general area. There was no "traffic piled up" so that the public could not get to the gasoline pumps.

Gene A. Johnson, the operator of Johnson Shell, Inc. located on Rockville Pike across from the Memco tract, stated that his station could add 25% more gasoline business. His sales of gasoline have decreased.

The last witness for the opposition was Dick Wilson, who operates a Shell station on the northwest corner of Rockville Pike and Rollins Avenue across from "Bill Crouch's Texaco." Mr. Wilson's service station is a "new modern station rebuilt in the last few years." It has four pump islands and could handle "double, probably three times what I am doing now . . . [w]ithout inconveniencing the customers." His customers do not have to wait in line "for either service or gasoline." He supplies "full service . . . anything so far in mechanical service." His gallonage for the past three months was down by approximately 8,000 or 9,000 gallons per month.

The Board, on November 9, 1971, filed its opinion. After reviewing the facts, it stated in its opinion:

"Upon consideration of the testimony and

> evidence of record, the Board cannot find that the petitioner has demonstrated a need for the proposed automobile filling station as required by Section 111-36.f. [now 59-124(f)] of the Zoning Ordinance inasmuch as there are already existing sufficient automobile filling stations equipped to serve the needs of vehicles traveling in each direction on Rockville Pike."

It passed an order the same day, denying the special exception.

As we have indicated, on appeal, the Circuit Court for Montgomery County was of the opinion that there was sufficient evidence before the Board to make the question of "need" fairly debatable and hence the Board's finding was not arbitrary and capricious and should be affrmed.

### (1)

*Constitutionality of Section 59-124(f)—formerly
Section 111-36f—of the Zoning Ordinance.*

Section 85-83 of the Montgomery County Code, as amended — Laws of Maryland, 1959, Chap. 780, as amended — provides, as follows:

> "85-83.  Special exceptions to zoning regulations.
>
> A district council, in its zoning regulations, may provide that the board of zoning appeals or the district council, or in Montgomery County, an administrative office or agency designated by the district council, *in appropriate cases and subject to appropriate principles, standards, rules, conditions, and safeguards set forth in the regulations, may either grant or deny, upon such conditions as may be deemed necessary to carry out the purposes of this Chapter, special exceptions and variances to the provisions of the zoning regulations in harmony with their general purposes and intent.* The decisions of the administrative office or agency in Montgomery County shall be subject to an appeal to either the board of appeals or such other

administrative body as may be designated by the district council, and such appeal shall follow that procedure which may, from time to time, be determined by the district council. The district council may also authorize the board of zoning appeals to interpret the zoning maps or pass upon disputed questions of lot lines or district boundary lines or similar questions as they arise in the administration of the regulations." (Emphasis supplied.)

Sections 59-123, 59-124, and 59-131 of the Montgomery County Code, as amended, provide in regard to special exceptions generally and special exceptions for automobile filling stations in particular:

"Sec. 59-123. Prerequisites to granting.

"(a) A special exception may be granted when the Board, or the Director, as the case may be, finds from a preponderance of the evidence of record that the proposed use:

"(1) Will be consistent with the general plan for the physical development of the district including any master plan or portion thereof adopted by the Commission;

"(2) Will be in harmony with the general character of the neighborhood considering population density, design, scale and bulk of any proposed new structures, intensity and character of activity, traffic and parking conditions, and number of similar uses;

"(3) Will not be detrimental to the use, peaceful enjoyment, economic value, or development of surrounding properties or the general neighborhood; and will cause no objectionable noise, vibrations, fumes, odors, dust, glare or physical activity;

"(4) Will have no detrimental effect on vehicular or pedestrian traffic;

"(5) Will not adversely affect the health, safety, security, morals, or general welfare of residents, visitors, or workers in the area;

"(6) Will not, in conjunction with existing development in the area and development permitted under existing zoning, overburden existing public services and facilities, including schools, police and fire protection, water, sanitary sewer, public roads, storm drainage, and other public improvements; and

"(7) Meets the definition and specific standards set forth elsewhere in this ordinance for such particular use.

"(b) The applicant for a special exception shall have the burden of proof which shall include the burden of going forward with the evidence and the burden of persuasion on all questions of fact which are to be determined by the Board or the Director."

Additional terms and conditions are contained in Section 59-124, which provides in pertinent part:

"Sec. 59-124. Additional terms and conditions.

"(a) The Board, or the Director, when appropriate, is hereby empowered to add to the specific provisions enumerated herein others that it may deem necessary to protect adjacent properties, the general neighborhood, and the residents, workers and visitors therein."

* * *

"(f) In addition to the findings required in sections 59-123 and 59-125 through 59-184, the following special exceptions may be granted when the board or director, as the case may be, *finds from a preponderance of the evidence of record that for the public convenience and service a need exists for the proposed use for service to the population in*

*the general neighborhood considering the present availability of such uses to that neighborhood:*

"(1) *Automobile filling stations.*
(2) Automobile and light trailer rental lot, outdoor.
(3) . . . .
(4) Automobile sales and service centers.
(5) Medical clinics.
(6) Swimming pools, community.
(7) Swimming pools, commercial." (Emphasis supplied.)

Section 59-131 contains special provisions in regard to automobile filling stations and, in relevant part, provides:

"Sec. 59-131. Automobile filling stations.

"(a) In a C-1, C-2, I-1, or I-2 zone, an automobile filling station may be permitted, upon a finding, in addition to findings required in sections 59-123 and 59-124, that:

"(1) The use will not constitute a nuisance because of noise, fumes, odors or physical activity in the location proposed.

"(2) The use at the proposed location will not create a traffic hazard or traffic nuisance because of its location in relation to similar uses, necessity or turning movements in relation to its access to public roads or intersections or its location in relation to other buildings or proposed buildings on or near the site and the traffic pattern from such buildings, or by reason of its location near a vehicular or pedestrian entrance or crossing to a public or private school, park, playground or hospital, or other public use or place of public assembly.

"(3) The use at the proposed location will not adversely affect nor retard the logical

development of the general neighborhood or of the industrial or commercial zone in which the station is proposed, considering service required, population, character, density and number of similar uses."

These provisions of the Montgomery County Zoning Ordinance were recently considered by us in *American Oil Company v. Board of Appeals of Montgomery County*, 270 Md. 301, 310 A. 2d 796 (1973). No challenge to their constitutionality on the specific grounds raised by Memco in the present case was made in that case and these specific grounds were not considered by us. We now turn to such a consideration.

Memco first contends that Section 59-124 (f) denies it due process of law guaranteed to it by Article 23 of the Declaration of Rights of the Maryland Constitution and by Section 1 of the Fourteenth Amendment to the Federal Constitution and also the equal protection of the laws also guaranteed to it by Section 1 of the Fourteenth Amendment. Its argument is two-pronged, *i.e.*, (a) Section 59-124 (f) permits the use of the zoning power to eliminate competition, as was allegedly done in this case, and hence bears no reasonable relationship to the public health, safety, morals, or welfare and (b) no adequate guides or standards are provided in the delegation of this zoning power to the Board.

(a)

We begin our consideration of the constitutional attack upon Section 59-124 (f) by observing that it is well established that an ordinance is presumed to be constitutional and the burden is upon the one attacking it to establish clearly that it is unconstitutional. *Gino's of Maryland, Inc. v. Mayor & City Council of Baltimore*, 250 Md. 621, 636, 244 A. 2d 218, 226-27 (1968) and prior Maryland cases cited in that opinion.

We have in prior decisions indicated that the use of the words "neighborhood" and "need" in ordinances delegating to zoning administrative bodies the power to grant special

exceptions gave a sufficiently definite guide for those bodies. In *Neuman v. Mayor & City Council of Baltimore*, 251 Md. 92, 246 A. 2d 583 (1968), the Board of Municipal and Zoning Appeals of Baltimore City granted a special exception to a physician for the use as a nonresident physician's office in Baltimore City of an apartment unit in an apartment house in a residential use district. The Baltimore City Zoning Ordinance required, *inter alia*, that the Board determine whether the grant of a special exception would menace the public health, safety, security, or morals and, as a further guide, the Board was required to give consideration to:

> " '(1) The *population density in the area in the vicinity of the premises* for which application for a Special Exception under the provisions of this section is made *indicating a need for the services* of a physician or of a dentist, as the case may be, in such area.
>
> " '(2) The testimony of property owners in the area in the vicinity of the premises *indicating a need* for the services of a physician or of a dentist, as the case may be, or the absence of testimony of such property owners that there is no such need.' " (Emphasis supplied) 251 Md. at 95-96, 246 A. 2d at 585.

Neighboring property owners appealed to this Court, contending that there was no evidence to support the Board's findings in regard to the area involved and the need for a physician's services in that area. We rejected this contention and stated in reference to the provision of the ordinance in regard to "need":

> "We have said that the term neighborhood in zoning law is a flexible and relative term which may vary from case to case. *Woodlawn Area Citizens Ass'n v. Board*, 241 Md. 187. Vicinity as used in § 16 must also be a flexible and relative term. Need for the services of a physician likewise must be considered as elastic and relative. Clearly, it does not mean absolute necessity. *Need has been*

> *judicially held to mean 'expedient, reasonably convenient and useful to the public * * *.' Baltis v. Village of Westchester* (Ill.), 121 N.E.2d 495, 503; *accord, Baltimore City v. C. & P. Telephone Co.*, 92 Md. 692 at 700-701; *Illinois Bell Telephone Co. v. Fox* (Ill.), 85 N.E.2d 43 at 51." (Emphasis supplied.) 251 Md. at 98-99, 246 A. 2d at 587.

There was no suggestion in *Neuman* that the words "neighborhood" and "need" include the power to suppress competition, or, indeed, any consideration other than the public health, safety, security, morals, and general welfare.

Memco correctly observes that we have indicated that "the prevention of competition is not a proper element of zoning" and that we have held that a person whose sole interest for objecting to the Zoning Board's action is to prevent competition with his established business is not a person aggrieved. *Kreatchman v. Ramsburg*, 224 Md. 209, 219, 167 A. 2d 345, 351 (1961) cited with approval by us in *Bryniarski v. Montgomery County Board of Appeals*, 247 Md. 137, 145, 230 A. 2d 289, 295 (1967) and in *Aspen Hill Venture v. Montgomery County Council*, 265 Md. 303, 314, 289 A. 2d 303, 308 (1972). We do not depart from this principle; but, as we see it, this principle is not applicable to the present case. As Judge Moorman in his opinion in the lower court pointed out, any denial of a commercial use prevents competition to some degree. He aptly stated:

> "The Court's attention has been directed to a series of cases holding that it is not proper to zone for the purpose of preventing competition (Kreatchman v. Ramsburg, 224 Md. 209, 167 A. 2d 345 (1961)). While it may appear at first glance that the application of the need requirement results in the prevention of competition, the question of whether the Board acted for the purpose of preventing competition must be answered on a case-by-case basis. Whenever the Board acts to deny the construction of a commercial establishment because no need therefor has been

shown, such action must, of necessity, result to some degree in the prevention of competition. The question in a particular case, however, is not whether the action of the Board incidentally resulted in the prevention of competition, but whether the Board's decision was based solely on a desire to prevent competition. Considering the facts in the instant case, if the Court were to apply the rule in the manner suggested by the appellant, an absurd result would be reached whereby the Board could not possibly prevent the construction of any filling station along the commercial corridor of Rockville Pike. Albeit that requirements other than need must also be met, it is the requirement of need that goes to the very heart of the Zoning Ordinance and enables the Board to effectively carry out the intent of the ordinance. If a contrary conclusion were to be reached, the practical effect would be that the Board could not effectuate the purpose of the Zoning Ordinance, which is designed to prevent the unreasonable and unnecessary accumulation of the same type of commercial establishment in the same general area."

In sum, Section 59-124 (f) is not facially unconstitutional as directed at the elimination of competition. Nor do the facts before the Board indicate that the purpose of the Board was to eliminate competition, as we will consider more fully later in this opinion.

(b)

Memco next contends that Section 59-124 (f) in using the words "need" and "general neighborhood," without further definition, is invalid as an attempted delegation of legislative power without sufficient guides and standards. We have already observed, however, in *Neuman* that these words have received a judicial gloss, sufficiently definite "to protect the people against any arbitrary or unreasonable exercise of power" in zoning cases, *Heath v. Mayor & City Council of Baltimore*, 187 Md. 296, 303, 49 A. 2d 799, 803

(1946), but, at the same time, giving sufficient "flexibility necessary to enable the administrative officials to carry out the legislative will," *Pressman v. Barnes*, 209 Md. 544, 555, 121 A. 2d 816, 822 (1956). *See Givner v. Commissioner of Health*, 207 Md. 184, 113 A. 2d 899 (1955) and *McBriety v. Mayor & City Council of Baltimore*, 219 Md. 223, 148 A. 2d 408 (1959). In our opinion, the guides and standards in Section 59-124 (f) are sufficient to sustain the constitutionality of this provision against the charge of the lack of such guides and standards.

This Court has held that, because of the danger to the public from fire due to a concentration of gasoline in too restricted an area, a Board of Zoning Appeals may refuse to approve an application to construct a gasoline filling station in such an area. *Hoffman v. Mayor & City Council of Baltimore*, 187 Md. 593, 51 A. 2d 269 (1947). In *Hoffman*, there were five existing filling stations in close proximity to the site of the proposed filling station. Judge Grason, for the Court, stated:

> "The protection against a fire hazard, given to a community by the Board, is a proper exercise of the police power."
> 187 Md. at 598, 51 A. 2d at 271.

The Board's action denying the application for the filling station was sustained notwithstanding a certificate by the Baltimore Board of Fire Commissioners (required by the Zoning Ordinance) that the proposed filling station was not a fire hazard. Since the decision in *Hoffman*, we have consistently held that a Zoning Board may give important consideration to the presence of other filling stations in the general area in reaching its decision in regard to granting or refusing an application for another filling station. *American Oil Company v. Board of Appeals of Montgomery County, supra; Board of County Commissioners for Prince George's County v. Lightman*, 251 Md. 86, 246 A. 2d 261 (1968); *Board of County Commissioners for Prince George's County v. Luria*, 249 Md. 1, 238 A. 2d 108 (1968); and *Mayor & City Council of Baltimore v. Biermann*, 187 Md. 514, 50 A. 2d 804

(1947). *See* 8 McQuillin, *Municipal Corporations*, § 25.178, at 597-611 (3rd ed. 1965). Indeed, in *Mayor & Council of Pocomoke City v. Standard Oil Co.*, 162 Md. 368, 159 A. 902 (1932), a city ordinance provided that *no* filling stations should be erected on Market Street between Front and Second Streets and that no permit should be issued for a filling station to be located within that area. The Circuit Court for Worcester County granted a writ of mandamus to compel the issuance of a permit for a proposed filling station within that area, but this action was reversed on appeal. Judge Offutt, for the Court, stated:

> "[T]he very multiplication of such stations might in itself constitute a menace, and . . . the right to restrain the number permitted to operate in a given territory within reasonable limits is a necessary incident of the police power, to be exercised with a due regard both of private rights and the public welfare."
>
> 162 Md. at 386, 159 A. at 908.

If the legislative authority may constitutionally prohibit filling stations totally from operating in a given area, it follows, *a fortiori*, that it can establish standards which applicants for permits to operate filling stations must meet. *See Kramer v. Mayor & City Council of Baltimore*, 166 Md. 324, 171 A. 70 (1934), citing *Pocomoke City* with approval and following it in sustaining an ordinance of Baltimore City by which the Mayor and City Council of Baltimore retained the right to legislate separately in regard to the issuance of filling station permits in areas in which they were not excluded by the Zoning Ordinance and in sustaining a restriction that such permits not be issued if the filling station was to be located within 300 feet of churches, orphanages, schools, and theaters.

The majority view and, in our opinion, the better view, is to the effect that the lack of need for another gasoline filling station in the vicinity of other stations is, as we have previously noted, an important factor that courts have relied upon in refusing a permit for a filling station. *See Turner v.*

*Cook,* 9 Misc. 2d 850, 168 N.Y.S.2d 556 (1957); *Ballard v. Roth,* 141 Misc. 319, 253 N.Y.S. 6 (1931); *Lemir Realty Corp. v. Larkin,* 11 N.Y.2d 20, 226 N.Y.S.2d 374, 181 N.E.2d 407 (1962); *McKinney v. City of Little Rock,* 201 Ark. 618, 146 S.W.2d 167 (1941); *Elizabeth City v. Aydlett,* 201 N. C. 602, 161 S. E. 78 (1931); and 2 Anderson, *American Law of Zoning,* § 11.31, at 315-16. *See also Gore v. Carlinville,* 9 Ill. 2d 296, 137 N.E.2d 368 (1956) and *Scott v. Champion Bldg. Co.,* 28 S.W.2d 178 (Tex. Civ. App. 1930); *and see Wiegan v. Board of Standards and Appeals of City of New York,* 229 App. Div. 320, 241 N.Y.S. 456, *aff'd* 254 N. Y. 599, 173 N. E. 883 (1930) where it was held that the authorities may properly consider the number of parking garages in a neighborhood and whether or not the needs of the public require more facilities of that nature. In 75 A.L.R.2d 168 *Zoning regulations as to gasoline filling stations,* at 275 (1961), it is stated:

> "[T]he fact that other gasoline filling stations were located in the immediate vicinity has been noted in a number of cases in which the courts, applying the zoning regulations, have refused a permit or variance for a filling station at the proposed site."

We are not unmindful that some decisions of the courts of other states take the position that a similar type of provision in regard to need for an additional filling station for the public convenience and necessity is unconstitutional as an unreasonable exercise of the police power inasmuch as the business of selling gasoline is not charged with a public use or duty to justify such a condition. *See Perdue v. Zoning Board of Appeals of City of Norwalk,* 118 Conn. 174, 171 A. 26 (1934). *See State ex rel. Killeen Realty Co. v. City of East Cleveland,* 108 Ohio App. 99, 153 N.E.2d 177 (1958); *Shuford v. Waynesville,* 214 N. C. 135, 198 S. E. 585 (1938); *Hirschorn v. Castles,* 113 N.J.L. 277, 174 A. 211 (1934). *See also Mobil Oil Corp. v. Board of Adjustment of the Town of Newport, Del.,* 283 A. 2d 837 (Del. Super. 1971). In view of the long line of decisions of this Court, already mentioned, beginning with *Pocomoke City, supra,* indicating that the

multiplication of filling stations in an area is a proper subject matter for the exercise of the police power, we do not find these decisions persuasive.

(2)

*The Board Had a Reasonable Basis to Support its Denial of the Special Exception.*

Memco finally contends that even if Section 59-124 (f) is held to be constitutional, nevertheless, in the present case, there was no reasonable basis upon which the Board could fail to find by a preponderance of the evidence before it that "for the public convenience and service a need exists . . . for service to the population in the general neighborhood considering the present availability of such uses to that neighborhood." We do not agree with this contention.

In *American Oil Co. v. Board of Appeals of Montgomery County, supra,* we stated:

"As we have decided many times, the courts will not substitute their judgment for that of the administrative authority acting within its powers if the issue involved is fairly debatable and the action of the administrative authority is thus not arbitrary and capricious resulting in a denial of due process of law as prohibited by Art. 23 of the Declaration of Rights of the Maryland Constitution. As we recently stated in *Shapiro v. Montgomery County Council,* 269 Md. 380, 388-89, 306 A. 2d 253, 257 (1973), quoting with approval from *Eger v. Stone:*

'As we stated in *Eger v. Stone,* 253 Md. 533, 542, 253 A. 2d 372, 377 (1969):

"We have made it quite clear that if the issue before the administrative body is 'fairly debatable' . . . the courts will not substitute their judgment for that of the administrative body . . . ."

"This rule will be adhered to even if we were

of the opinion that the administrative body came to a conclusion we probably would not have reached on the evidence." '

"In *Adler v. Mayor & City Council of Baltimore*, 200 Md. 623, 628-29, 155 A. 2d 504, 507 (1959), we articulated this same basic doctrine as particularly related to the refusal of a special exception by the Board of Municipal and Zoning Appeals of Baltimore City even though the City Fire Department, the Health Department and the Department of Traffic and Transit all approved the application. We there stated the following:

'Whether the approval needed [for the granting of the special exception for an automobile filling station] was that of the Council or the Board, this Court consistently has held that the test of the validity of the refusal to allow a filling station at a given site is not whether the action is supported by substantial evidence, and not whether the court agrees with the findings, or the result, but rather whether there was a reasonable basis to support the refusal as an exercise of the police power. To state it conversely, the court will not upset the refusal unless the bounds of the police power have been exceeded and the applicant deprived of his property without due process of law. *Kramer v. Mayor and City Council*, 166 Md. 324; *Mayor and City Council v. Biermann*, 187 Md. 514; *Hoffman v. Mayor and City Council*, 187 Md. 593; *Maryland Advertising Co. v. Mayor and City Council*, 199 Md. 214; *Gilmor v. Mayor and City Council*, 205 Md. 557.'

"See *Crown Central Petroleum Corp. v. Mayor & City Council of Baltimore*, 258 Md. 82, 265 A. 2d 192 (1970) and *Mayor & City Council of Baltimore v. Muller*, 242 Md. 269, 277-78, 219 A. 2d 91, 96-97

(1966), following *Adler* and quoting from the *Adler* opinion."

In *American Oil Company*, we also indicated that we had held in a number of prior cases "that a Board may consider as important the presence of other filling stations in the general area in reaching its decision in regard to granting or refusing an application for another filling station," citing with approval and following *Lightman*, *Luria*, and the prior Maryland cases cited in the opinions in those cases. In *American Oil Company*, there were eight other filling stations within 3.4 miles of the site for the proposed filling station; in *Lightman*, seven filling stations within 2,500 feet; in *Luria*, 11 filling stations within 3/4 of a mile; in *Hoffman*, five filling stations near the site of the proposed filling station — two on opposite corners.

In the present case, there are five filling stations nearby — one on each of the four corners of the intersection of Rockville Pike and Rollins Avenue and a fifth filling station, Johnson's Shell, directly across from the Memco tract on Rockville Pike. In addition, there are 20 other filling stations within a distance of 3.8 miles, which is the marketing area properly considered to be the "general neighborhood" under the provisions of Section 59-124 (f). In short, the present case presents a greater concentration of filling stations in the general neighborhood than any reported Maryland case. Surely, the Board had a reasonable basis, *prima facie*, for concluding that a need for an additional filling station for the public convenience and service had not been established by a preponderance of the evidence.

Memco seeks to distinguish the present case from our prior decisions on three grounds, *i.e.*, (a) the different appeal of the proposed filling station to Memco customers who pay a one-time $1 fee for a lifetime membership card as opposed to the filling stations of the major oil companies which are "highway-oriented"; (b) the fact that Memco will conduct a "discount operation" by selling gasoline from three to five cents cheaper than do the major oil company filling stations; and (c) in *Lightman*, *Luria*, *Kramer* and *Biermann*, there were traffic or other hazards not present in this case.

(a)

The restricted nature of Memco's contemplated sales of gasoline to its own customers who have the required $1 membership card is hardly a reason to move the Board to find from a preponderance of the evidence that Memco had established a need for "the proposed use for service to the population in the general neighborhood" as specified in Section 59-124 (f). As already set forth, Board member O'Brien rather disposed of this contention on the facts when he asked Mr. Hatfield "Why does the public need a new gas station on Rockville Pike?" and Mr. Hatfield replied "It *completes our one-stop shopping complex* which is a national advertised program," and declined to give a "fuller" answer when invited to do so by Mr. O'Brien. In short, the "need" is to serve Memco's selling policy; it does not establish a need by the population in the general neighborhood.

It should be kept in mind, too, that, unlike the situation in *American Oil,* there was substantial evidence by the opposition in the present case, affirmatively indicating through several witnesses and documentary exhibits that there was indeed no need for a new filling station in the general neighborhood in view of the rather extraordinary number of existing filling stations and a marked general decline in gasoline sales beginning in the year 1971. Many of the existing stations could easily supply the population in the general neighborhood with gasoline, there being no delays in supplying the public at the present time and ample facilities for the sale of additional gasoline. Memco urges that this testimony should have been disregarded by the Board in view of the interest of the opposition witnesses in preventing the competition from the additional proposed filling station. Much of the testimony was factual, based upon a representative survey of the filling stations in the area as to their gallonage of sales, their decline in sales, etc. The interest of the witnesses in the matter went to the *weight* of their testimony and was a matter for the Board to consider and evaluate. In short, the question of need was fairly debatable and the Board could reasonably find that Memco had not established a need for the proposed filling station under the criteria set forth in Section 59-124 (f).

## (b)

Memco stresses its discount operation in gasoline sales as indicating a "need" for such a station. Here again, however, the evidence before the Board established that there were *two* discount operations already in existence in the marketing area — the Giant and Gem operations — and Mr. Lipkin testified that "Memco is very similar to Gem operation, in fact we are almost parallel. We feel Memco actually is Gem ten years ago." The Board could accept this testimony, which shows that any "need" for a discount operation in the sale of gasoline was already provided in the marketing area and that Memco had not established such a need in the general neighborhood, rather than the testimony of the Memco witness.

## (c)

Memco is correct in observing that in *Lightman, Luria, Kramer,* and *Biermann,* there were facts in regard to possible traffic or other hazards which are not present in the instant case. In *American Oil,* however, no such facts existed and only the question of "need" under Section 59-124 (f) was involved. In our opinion, our decision in *American Oil* is dispositive of the present case on the merits. *See also Hoffman v. Mayor & City Council of Baltimore, supra.*

We noted in *American Oil* that Amoco had offered no studies or reports indicating a possible need by the population in the general neighborhood of the proposed filling station. The same situation exists in the present case. Memco offered no studies or reports, possibly showing the number of residents in the marketing area, the average number of automobiles per household, the average number of gallons of gasoline consumed per vehicle in Maryland, and the indicated desire of a substantial number of residents that a Memco filling station was desired, in order to establish a possible need for an additional gasoline filling station at the Memco site. Memco clearly had the burden of proof to establish that need by a preponderance of the evidence. The Board could reasonably find that it had not met its burden.

In sum, the issue of "need" under the criteria set out in Section 59-124 (f) was fairly debatable and we will not substitute our judgment for that of the Board. *American Oil, supra,* and prior Maryland cases therein cited.

The Board filed a motion to dismiss the appeal in the instant case, pursuant to Maryland Rule 835 b 8 on the ground that the case was moot because Memco, pending the hearing of the appeal, had applied for a permit to erect the proposed TBA (tires, batteries and accessories) building and had proceeded to erect that building, indicating that the facility would be opened "even if the special exception request is denied."

There is little doubt that we will generally dismiss an appeal when the case has become moot and will rarely decide purely academic questions or give advisory opinions. *Area Development Corp. v. Free State Plaza, Inc.,* 254 Md. 269, 254 A. 2d 355 (1969). In the present case, the facts do not indicate to us that the case had become moot by the erection of the TBA building in which gasoline *would not be sold* until Memco could obtain a favorable result in this Court and obtain its hoped for permit to use the site as an *automobile filling station.* The proof indicated that not all Memco operations have facilities to sell gasoline and, indeed, there are two Memco operations in Maryland which do not sell gasoline. In short, we do not consider the obtention of a permit to construct and the actual construction of the TBA building as being inconsistent with a further attempt to obtain a permit for a gasoline filling station or as putting Memco to any election between the two. The motion to dismiss will be denied.

> *Motion to dismiss the appeal denied; order of April 6, 1973, affirmed, the appellant to pay the costs.*